[No. D056670. Fourth Dist., Div. One. Apr. 25, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUCHEHR RIAZATI, Defendant and Appellant.

## Counsel

Patrick M. Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**NARES, J.**—Manuchehr Riazati accumulated at his residence more than 90 animals, which the County of San Diego Department of Animal Services (Department) ultimately seized pursuant to a search warrant after animal

control officers made multiple unsuccessful attempts to persuade Riazati to rectify code violations concerning the living conditions of the animals. A jury convicted Riazati of two counts of felony animal neglect (rabbits & dogs) and four counts of misdemeanor animal neglect (chickens, birds, guinea pigs & a duck) in violation of Penal Code[1] section 597, subdivision (b) (hereafter section 597(b)). The court suspended imposition of sentence for five years, granted formal probation to Riazati, and ordered him to pay $42,263 in restitution and fines.

Riazati appeals, contending (1) the evidence is insufficient to support any of his six animal neglect convictions because there is no evidence he "failed to properly provide food, water, or shelter to the six species of animals under his care in a manner that created a high risk of death" to the animals, and thus there is no evidence he acted with the gross negligence required for a conviction under section 597(b); and (2) the court prejudicially erred and violated his rights to due process and a fair trial by instructing the jury (at Riazati's request) that he could be found guilty of animal neglect under section 597(b) if his acts or omissions created a high risk of great bodily injury to an animal under his care, thereby reducing the prosecution's burden of proof.

We conclude (1) Riazati is barred under the doctrine of invited error from challenging the jury instructions on the elements of the offense of animal neglect (§ 597(b)) and the definition of gross negligence given by the court, because his repeated and successful requests for those instructions were the result of a deliberate tactical choice at trial; (2) Riazati's instructional error claim is unavailing on the merits because the challenged instructions are correct statements of applicable law; and (3) the evidence is sufficient to support all six of his section 597(b) animal neglect convictions. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

### A.  *The People's Case*

It is undisputed that the Department received complaints about the condition of animals at Riazati's residence and that during multiple visits there on and between February 28 and April 16, 2008,[2] Department officers observed more than 90 animals.

---

[1] All further statutory references are to the Penal Code.

[2] All further dates refer to calendar year 2008.

*February 28*

On February 28, Shalimar Oliver, an animal control officer employed by the Department, responded to a complaint from one of Riazati's neighbors regarding an aggressive dog on Riazati's roof that was trying to jump down and possibly attack people walking by. When Officer Oliver arrived at Riazati's home, she observed in the front yard various items of junk and holes in the ground that were filled with water with insects flying around. She detected a strong, foul odor emanating from both the front yard and the home. While knocking on the front door, Officer Oliver heard dogs barking and the sound of a lot of birds inside the home.

When Riazati answered the door, Officer Oliver, who was assisted by other officers, identified herself and explained she was there to investigate the complaint the Department had received. Riazati said one of his dogs might have been able to get on the roof from bales of straw located on the side of the house. Officer Oliver and Riazati entered the side yard on the left side of the home and observed a tethered juvenile German Shepherd-type dog, which was not sheltered from the elements and was lying in a muddy area with insects flying around it. The dog had no access to food or water.

In the backyard, Officer Oliver saw a large number of "random junk items," such as an old toilet, and smelled a very noticeable odor of feces and urine. She testified that the feces "smelled as though it had been there for a while." During the visit, Officer Oliver observed five dogs on the property. They did not have dog tags, and only one was licensed. As Riazati, who was becoming argumentative and uncooperative, did not want to purchase licenses through Officer Oliver, she issued a correctable citation.

When Riazati went inside to get his identification, Officer Oliver noticed an enclosed patio with a sliding glass door. A chicken that had come through the vertical blinds was leaning its head against the glass door in an unresponsive and atypical manner. Through the blinds Officer Oliver saw rabbits and guinea pigs, and she could hear birds, some of which were flying through the vertical blinds.

After explaining to Riazati her concern about the animals, Officer Oliver entered the enclosed back patio to check on their welfare. With free-roaming rabbits and guinea pigs at her feet, she noticed she was standing on what appeared to be soiled hay and feces. She saw at least 20 rabbits running

around and numerous noisy birds flying around. She saw about 30 birds, most of which were caged. Officer Oliver counted nine chickens, including the free-roaming chicken she saw leaning against the glass door; eight were in a cage that did not give them enough room to move around. The room had a very strong odor of a combination of feces and urine, and the sharp scent of ammonia associated with urine caused Officer Oliver's eyes to water. The ventilation was inadequate because the windows in the room were barely open. The free-roaming chicken appeared weak. Feces appeared to be on the birdseed inside the bird cages, and the color of the water in the cages was brownish green. Some of the water had feces in it. The coats of some of the rabbits and guinea pigs appeared to be stained with feces.

From the enclosed back patio, Officer Oliver was able to see more animals in the living room and kitchen areas. When she entered those areas, Officer Oliver saw on the kitchen floor stains of significant size that appeared to be smeared feces. She smelled in both the kitchen and the living room the same strong odor of feces and urine. She found a glass aquarium full of finches and saw one that was missing a large amount of feathers, which caused her concern that other birds were picking on it. She was also concerned about the poor sanitation inside that aquarium. She found an adult Boxer inside a crate covered by a blanket. The dog appeared to be thin, and it had no access to water. Officer Oliver advised Riazati about how to properly feed the dog.

Riazati did not allow Officer Oliver and the other officers to further inspect the house. Officer Oliver explained to Riazati the violations she observed, advised him how to improve the conditions of the animals, and issued him a notice of complaint. The violations she noted were inadequate food, inadequate water, inadequate ventilation, and inadequate sanitation. Riazati relinquished a rat, and Officer Oliver took no other animals because the Department's aim was to educate people and give them a chance to correct the violations.

*March 8*

Officer Oliver, accompanied by police officers, returned to Riazati's home on March 8. The front yard appeared to be in about the same condition. In the backyard, the items of junk appeared to have been rearranged in different piles, but were still cluttering the yard. The rabbits and guinea pigs had been moved into a penned area in the backyard. Officer Oliver did not see rabbit pellet food, leafy greens, or other food in that area, and she testified she could not recall seeing any water there. Insects were buzzing around. She was concerned about the poor sanitation in the pen as the animals were living in their own filth.

Officer Oliver saw four of the five dogs, and their condition was the same as it had been on February 28. She continued to be concerned with shelter and sanitation. The penned area for the dogs did not have a roof, and the odor was strong and foul.

Many of the birds had been moved into the backyard. The cages were on top of each other, allowing the birds in the upper cages to urinate and defecate on the birds in the lower cages. The bird food was still contaminated with feces and urine, and the water appeared to have feces in it. The shelter for the birds was inadequate as there was no roof over most of the cages.

The condition of the finches in the glass aquarium inside the house was the same. Officer Oliver was concerned about the urine and feces in the food and water.

Riazati had removed some of the soiled hay and feces in the enclosed patio. However, a significant amount remained.

Officer Oliver advised Riazati he needed to fix the issues concerning food, water, and shelter for the animals. She orally advised Riazati what he needed to do as to each type of animal.

*March 15*

On March 15, Officer Oliver returned alone to Riazati's home. Riazati was not at home, and she was not able to access the backyard or look at the animals. The condition of the front yard was not significantly changed.

*March 21*

On March 21, Officer Oliver, accompanied by another Department officer, again returned to Riazati's home. She took photographs of the front and backyards and most of the inside of the house. Riazati told her he had not had time to make many corrections. He told Officer Oliver he was trying to sell one of the dogs.

The condition of the front yard was improved, but not significantly. The yard was still cluttered and the odor of feces was still there. The Boxer still appeared to be thin.

The condition of the backyard was similar to the condition Officer Oliver had previously observed. She was concerned about the shelter of the caged birds, cockatiels and parakeets, as the tray top was insufficient. She was still concerned about sanitation as the water in the cages was brownish green

and had feces in it. The food containers did not contain edible food. Officer Oliver saw feces in the birdseed. The birds did not have adequate shelter from extreme temperatures. She also testified that sanitation was poor because of the amount of feces in the cages.

Officer Oliver was also concerned about the condition of the estimated 20 rabbits in the backyard. Bales of hay were part of the fencing for the enclosure, but the animals did not have adequate shelter from the sun. Sanitation was poor as there were feces everywhere. Officer Oliver did not see any rabbit food. Guinea pigs were with the rabbits. The conditions had not changed much since Officer Oliver's last visit. She observed an empty bowl with feces in it. Another container that was too high for the animals to reach was full of brownish water that was not suitable for drinking. The officers smelled the odor of a dead animal and found a dead young rabbit locked inside a cage.

A lot of the clutter had been cleared out of the back area of the enclosed patio, but some cages were still in the room. Hay and feces were still on the floor.

In the living room and kitchen areas, several bird cages were still piled on top of each other so that the birds on top would urinate and defecate on the birds in the lower cage. The bird food and water were still contaminated with feces. The finches were still in a fish tank. The food and water in the tank were contaminated with feces and urine. The water was brownish green. Riazati had not fixed anything that Officer Oliver had asked him to fix.

Officer Oliver observed an adult German Shepherd that was confined in the back kennel area of the backyard and heard another dog that appeared to be confined in a crate in one of the bedrooms. She observed a chicken in the backyard that had inadequate shelter and contaminated food and water.

Riazati was no longer at home when the officers finished their inspection. Officer Oliver posted preimpoundment notices on the front door instructing Riazati what he needed to do to correct the violations.

*March 22*

Officer Oliver returned to Riazati's home the next day, March 22. Riazati was not at home. Officer Oliver was able to see the condition of the animals outside the house. The water in some of the water containers for the birds was not so dark in color, but otherwise the condition of the animals was the same.

*Execution of the search warrant on April 16*

The Department obtained a search warrant to retrieve the animals from Riazati's home. Several other Department officers as well as several police officers assisted Officer Oliver in executing the search warrant on April 16. The execution of the warrant was photographed and videotaped. The videotape was admitted into evidence and played for the jury.

Officer Oliver testified that during the execution of the search warrant, she observed no significant change in the condition of the animals in the backyard. Feces covered the bottom of cages. The water in the water bowls for the rabbits and guinea pigs was brownish green and contained feces.

The officers found two rabbits inside Riazati's garage. Officer Oliver testified the rabbits were standing on wire flooring, the tray beneath the wiring was saturated with urine and feces, and the water was contaminated.

The officers found another rabbit in a cage in the kitchen area. Officer Oliver testified the rabbit had some serious wounds on its back end that the medical operations manager needed to inspect.

A water container in the dog kennel area of the backyard appeared to have bacteria growing inside it, and the water was green. Larvae were growing in a water bowl. The officers also found a dog food bowl that contained old food and another bowl with food that smelled rotten. The officers found three dogs inside the house. A dog in a crate had dirty water and the amount of the water was insufficient.

Officer Oliver again found birds inside Riazati's home. The only change in the condition of the birds was that they had been moved back inside the house. The food bowls in the cages contained a heavy amount of feces. Water bowls contained water that was discolored and contaminated with feces.

In the backyard, the officers found a free-roaming duck, which they caged. They also found a chicken in the backyard where the birds were previously located. The shelter for the chicken consisted of a piece of plastic over the wire cage, which was insufficient, and feces were all over the cage.

During the execution of the search warrant, the officer seized and inventoried 90 animals.

*Medical examination of the seized animals*

All of the seized animals were taken to the Central Animal Shelter, where they were examined by Dr. Julie Maher, a Department veterinarian. The

German Shepherd had hair loss around the tail, indicating malnutrition and exposure to dirty conditions. It also had scars on both ears, indicating fly bites resulting from poor sanitation. Another dog, a Chow Chow (Chow) puppy, had green nasal discharge and abnormally quiet lungs, indicating bacteria, fluid, and pus in the lungs. Maher put the dog, which was suffering from pneumonia, on antibiotics. The puppy was very underweight, had lost the muscle mass along its spine, and had no palpable fat. Tapeworms were seen in the stools of the Chow and a couple of the other seized dogs, including another German Shepherd.

Maher testified she watched the video and saw the photographs of the living conditions of the animals at Riazati's home and opined there were too many rabbits there, they did not have enough uncluttered and safe living space, and they had inadequate food and water. The guinea pigs should have had a solid cage floor because they are prone to get sores on their feet from wire bedding. They also should have had a sipper bottle with water and a place to hide because they are a very nervous prey species. Maher testified that the main medical problems she observed regarding the majority of the rabbits and guinea pigs were dehydration and low body weight, which she opined was caused by underfeeding. The young, dehydrated, brownish-red rabbit with abscesses over its pelvis and on its back probably suffered those wounds as a result of other rabbits biting it. The rabbit, whose fur was dirty with feces, also had tattered ears. Maher opined the ears were tattered as a result of fighting with other rabbits, overcrowding, and/or lack of sanitation and food.

Maher examined the duck, which was emaciated and covered with feces. No shelter or bathing water was provided for the duck in Riazati's backyard.

Maher also examined the free roaming chicken, which was emaciated. Maher opined the chicken was starving from inappropriate or not enough food at the time it was seized.

Maher opined the birds were not provided adequate shelter. The cages were full of feces, and they were overcrowded. Birds should not eat their own feces, which contain bacteria and parasites that can cause disease. She also opined the birds had inadequate food, which appeared to be covered with bird droppings. The water for the birds was contaminated with bird droppings, algae, or bacteria. Contaminated water transmits parasitic, bacterial, and fungal diseases.

### B. *The Defense Case*

Moghadase Tavakoli, Riazati's mother, indicated she found her brown rabbit had injured its back in a cage at her home. She called Riazati, who applied medication to the injury and took the rabbit.

David Adam Baruch, Riazati's neighbor, went to Riazati's house twice between February 28 and April 16. On the first visit he saw water and food in the bird cages. He did not smell feces in the house. Baruch did not recall seeing a brown rabbit in a cage. He returned to Riazati's home on April 14. He saw birds in cages inside the house and rabbits and guinea pigs in the penned area outside the house, but no dogs. He did not see any dead rabbits, and the rabbits acted normally. Riazati's rabbits had adequate food and water and appeared hydrated and of proper weight.

Ehsan Bagheri-Anderson, Riazati's nephew, went to Riazati's house in early March after he learned about the Department officer's visit on February 28. He looked inside the bird cages, which were clean, and saw clean water and food. Bagheri-Anderson returned to Riazati's house in early April. Riazati was cleaning the brown rabbit's injury, applying hydrogen peroxide and an ointment. The water in the rabbit's cage was clear.

Bagheri-Anderson again returned to Riazati's house on April 13 and took video footage inside the house. He videotaped the bird cages to show the water and food. He also videotaped the rabbits. He opined that Riazati provided clear, good water, appropriate food, and shelter for the animals.

Defense expert Gayle Roberts, a veterinarian, who had no formal training in animal neglect cases and did not personally examine the animals or see their living conditions before the April 16 video, relied on the records to form her opinions. A rabbit may develop a skin condition as a result of a bite wound, and it is appropriate to treat such a skin condition at home with hydrogen peroxide and Neosporin. She opined that among the rabbits at Riazati's home were no common rabbit problems one would expect when the food, water, and shelter are inadequate. In the April 16 video, the rabbits looked playful, bright, and alert. While one bowl of water looked contaminated with feces, rabbits could drink it. The injured rabbit was alone in a cage, which was appropriate to prevent the other rabbits from hurting it further.

Although the German Shepherd had fly strike scars, fly strikes are normally not fatal and are common with outside dogs. None of the dogs had distemper, diarrhea, kennel cough, heatstroke, hookworm, roundworm, or coccidiosis. Roberts testified the video showed the dogs were friendly, greeting the officers and jumping on them. She would have expected to see signs of vomiting or diarrhea if the dogs had been eating rotten food. Although the Chow was diagnosed with pneumonia, it was not coughing at intake and its alleged nasal discharge was not apparent in the video. Roberts indicated there was no evidence the three dogs, the German Shepherd and the two German

Shepherd mixes, were improperly fed or watered, and it was appropriate to house the sick Chow separately. She indicated that tapeworms are not a major risk to an animal's life.

Birds sometimes defecate in their water and food bowls and sometimes put food in their water, which can discolor it. Roberts indicated that birds eat around feces in their food. The bird with feather loss was overplucking its own feathers.

On cross-examination, Roberts testified she had never before encountered a client who had so many animals. She would not give her dog the food and water shown in certain photographs of Riazati's yard. She acknowledged the food could be a cause of disease if a dog ate it, and it was possible the water could also lead to disease if a dog drank it.

## DISCUSSION

### I. *CLAIM OF INSTRUCTIONAL ERROR*

Riazati contends the court prejudicially erred and violated his rights to due process and a fair trial by instructing the jury (at Riazati's request) that he could be found guilty of animal neglect under section 597(b) if his acts or omissions created a high risk of "great bodily injury" to an animal under his care, thereby reducing the prosecution's burden of proof. He asserts that "the problem lies in the inclusion of 'great bodily injury' as an element in the present offense." For reasons we shall discuss, we conclude Riazati's contention is unavailing because (1) he is barred under the doctrine of invited error from challenging on appeal this portion of the jury instructions on animal neglect (§ 597(b)) and the definition of gross negligence given by the court, and (2) the instructions are correct statements of the applicable law.

### A. *Background*

In the People's trial brief, the prosecutor noted there is no standard jury instruction on the elements of a violation of section 597(b) and requested that the court give the jury the instruction on animal cruelty that the Court of Appeal approved in *People v. Speegle* (1997) 53 Cal.App.4th 1405, 1412–1413 [62 Cal.Rptr.2d 384] (*Speegle*), which informed the jury in that case that the prosecution was required to prove the defendant committed a " 'grossly negligent act or omission' " that " 'caused danger to an animal's life.' "[3]

---

[3] The trial court in *Speegle* gave the following jury instruction: " 'Defendant is accused . . . of Cruelty to an Animal, in violation of . . . section 597(b), a felony. [¶] Every person who

The prosecutor also requested an instruction on the definition of "gross negligence" based on *People v. Brian* (1980) 110 Cal.App.3d Supp. 1, 4–5 [168 Cal.Rptr. 105] *(Brian)*, in which the appellate department of the superior court held that a conviction under section 597(b) for animal neglect requires proof of criminal negligence, not ordinary negligence, which the court defined as conduct amounting to a reckless, gross, or culpable departure from the ordinary standard of due care; in other words, conduct that is such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for animal life.

During a discussion regarding jury instructions after the parties rested, defense counsel objected to the instructions proposed by the prosecutor. Specifically, Riazati's counsel objected to the portion of the proposed instruction stating that in order to prove animal neglect, the People must prove that Riazati committed an act or omission that "caused danger to an animal's life." Defense counsel stated: "I do not believe that is the standard under gross negligence. Gross negligence requires something much more. . . . [¶] . . . [¶] [S]omething *more is required than just mere danger to an animal's life* if we are talking about gross negligence." (Italics added.) Relying on *People v. Rodriguez* (1960) 186 Cal.App.2d 433 [8 Cal.Rptr. 863] *(Rodriguez)*, which involved an appeal from an involuntary manslaughter conviction and addressed the meaning of criminal negligence, Riazati's counsel argued that a finding of gross negligence requires proof defendant's alleged act or omission caused a "high degree of risk" of "death or great bodily injury."[4] He reiterated that defendant's act or omission must cause "a *high degree of risk* of death or of *great bodily injury* to an animal's life. And that's the language that I am citing from *Rodriguez*. Risk of death or *great bodily harm*. It must

---

causes an animal to be deprived of necessary sustenance, drink or shelter, or, who, having care or custody of an animal, subjects the animal to needless suffering or fails to provide the animal with proper food, drink, or shelter, in a grossly negligent manner, is guilty of felony cruelty to an animal. [¶] Deprivation of necessary sustenance, drink, or shelter is unlawful when a person commits an act or omission inherently dangerous to animal life or safety or . . . which would inherently produce danger to an animal's life. [¶] Subjecting an animal to needless suffering and failure to provide an animal with proper food, drink or shelter are both unlawful when a person . . . commits an act or omission which would inherently produce danger to an animal's life. [¶] *In order to prove such a crime, each of the following elements must be proved*: [¶] (1) That a person has custody or is responsible for providing care to an animal[;] [¶] (2) That person *committed a grossly negligent act or omission*[; and] [¶] (3) That act or omission *caused danger to an animal's life.*' " *(Speegle, supra,* 53 Cal.App.4th at pp. 1412–1413, italics added.)

[4] The *Rodriguez* court stated: "It is generally held that an act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a *high degree of risk of death or great bodily harm. The risk of death or great bodily harm must be great*." *(Rodriguez, supra,* 186 Cal.App.2d at p. 440, italics added.)

be *great*. And here in the [People's proposed] instruction all it says is 'a danger.' Clearly *that is not what gross negligence is about*." (Italics added.)

Noting that *Rodriguez* addressed a crime that involved a homicide, the prosecutor challenged defense counsel's reliance on that case, stating that "what we are talking about is very different. We are talking about a general intent crime that requires a mental state. And I believe that the definition [of gross negligence] . . . that comes from *Brian*[, *supra*, 110 Cal.App.3d Supp. 1], I think, is appropriate." However, essentially agreeing with defense counsel, the prosecutor then asked the court to give the definition of gross negligence set forth in CALCRIM No. 970, which addresses the crime of shooting a firearm in a grossly negligent manner and provides in part: "A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that *creates a high risk of death or great bodily injury*[; AND] [¶] 2. A reasonable person would have known that acting in that way would create such a risk." (Italics added.)

### 1. *The court's rulings*

The court rejected the instruction approved by the Court of Appeal in *Speegle, supra*, 53 Cal.App.4th 1405, on the ground it would confuse the jury and granted Riazati's request that, in defining the elements of the crime of animal neglect (§ 597(b)), the court instruct the jury that a defendant's alleged act or omission must create a high degree of risk of death or great bodily injury to an animal.

The court also ruled it would "take the gross negligence definition right out of [CALCRIM No.] 970," which the court found "encapsulates the definition in *Brian*[, *supra*, 110 Cal.App.3d Supp. 1]," and it would also "change human life to animal life." Riazati's counsel supported the prosecutor's request for such an instruction.

### 2. *Jury instructions given by the court*

The court later instructed the jury under section 597(b) as follows, including the phrase "high risk of . . . great bodily injury to an animal" requested by Riazati's counsel:

"Defendant is accused in Counts [1] though [6] of the Information of Animal Neglect, in violation of . . . section 597(b).

"Every person who causes an animal to be deprived of necessary sustenance, drink or shelter, or, who, having care or custody of an animal, subjects

the animal to needless suffering or fails to provide the animal with proper food, drink, or shelter, in a grossly negligent manner, is guilty of animal neglect.   ·

"Deprivation of necessary sustenance, drink, or shelter is unlawful when a person commits an act or omission inherently dangerous to animal life or safety or which would inherently produce danger to an animal's life.

"Subjecting an animal to needless suffering and failure to provide an animal with proper food, drink or shelter are both unlawful when a person commits an act or omission which would inherently produce danger to an animal's life.

"In order to prove such a crime, the People must prove each of the following elements beyond a reasonable doubt:

"1. [Riazati] had custody or was responsible for providing care to an animal[;]

"2. [Riazati] committed a grossly negligent act or omission[; and]

"3. That act or omission created a *high risk of* death or *great bodily injury to an animal*." (Italics added.)

Using a modified version of CALCRIM No. 970, the court also instructed the jury as follows on the definition of gross negligence, again using the phrase "high risk of . . . great bodily injury" as Riazati's counsel requested:

"To prove that the Defendant is guilty of the crimes charged in Counts [1] through [6,] the People must prove that Defendant acted with gross negligence.

"Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when:

"1. He or she acts in a reckless way that creates a *high risk of* death or *great bodily injury*[;] [¶] AND

"2. A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for animal life or indifference to the consequences of that act." (Italics added.)

### B. Applicable Legal Principles

■ A trial court is required to instruct the jury on " ' "the general principles of law relevant to the issues raised by the evidence." ' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], overruled on a different ground in *People v. Barton* (1995) 12 Cal.4th 186, 200 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

When, as here, a defendant claims that a jury instruction misstated the law, the reviewing court considers the charge in its entirety to determine whether there is a reasonable likelihood that the jury misunderstood the applicable law. (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) We independently review the legal adequacy of a jury instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

#### Doctrine of invited error

■ "The doctrine of invited error bars a defendant from challenging [on appeal] an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248]; accord, *People v. Harris* (2008) 43 Cal.4th 1269, 1293 [78 Cal.Rptr.3d 295, 185 P.3d 727]; see also *People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3 [153 Cal.Rptr. 40, 591 P.2d 63] ["The doctrine of invited error applies to estop a party from asserting an error when 'his own conduct *induces the commission of error.*' "].)

### C. Analysis

At issue in this appeal is the italicized language in the two instructions (discussed, *ante*) that informed the jury it could find Riazati guilty of animal neglect in violation of section 597(b) if it found beyond a reasonable doubt that he committed a reckless act or omission that created a high risk of "great bodily injury" to an animal.

#### 1. *Riazati's instructional error claim is barred under the invited error doctrine*

The Attorney General asserts that Riazati invited his claim of instructional error by requesting, for a deliberate tactical purpose, the wording he now challenges on appeal, and thus, under the invited error doctrine, he "should not now be allowed to rely on that very fact to argue instructional error occurred." We agree Riazati's instructional error claim is barred under the invited error doctrine.

The record shows the defense successfully requested that the court include the now challenged language in its instructions on the elements of the charged section 597(b) animal neglect offenses and the definition of the term "gross negligence." In so doing, Riazati, through his trial counsel, acted with the deliberate tactical purpose of increasing the prosecution's burden of proof. The record shows that defense counsel objected to the instruction initially proposed by the prosecutor that would have required the People to prove Riazati committed an act or omission that "caused *danger* to an animal's life." (Italics added.) In support of the defense objection to that proposed instruction, Riazati's counsel stated, "I do not believe that is the standard under gross negligence. Gross negligence requires something *much more*." He then requested that the court instruct the jury that, to find Riazati guilty of animal neglect in violation of section 597(b), the People were required to prove that Riazati committed an act or omission that "created a *high risk* of death or *great bodily injury* to an animal." (Italics added.) The prosecutor objected that Riazati's request "adds to the [People's] burden of proof."

The foregoing record demonstrates that defense counsel requested the inclusion of the now challenged phrase "high risk . . . of great bodily injury" in the two subject instructions for the deliberate tactical purpose of increasing the prosecution's burden of proof with respect to all six animal neglect charges. Accordingly, we conclude Riazati's instructional error claim is barred under the invited error doctrine. (*People v. Harris, supra*, 43 Cal.4th at p. 1293; *People v. Lucero, supra*, 23 Cal.4th at p. 723; *People v. Perez, supra*, 23 Cal.3d at p. 549, fn. 3.) However, in order to forestall a claim of ineffective assistance of counsel, we consider that claim on the merits. (See *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 151 [15 Cal.Rptr.2d 167].)

### 2. *Riazati's instructional error claim is unavailing on the merits*

■ In *Speegle, supra*, 53 Cal.App.4th at page 1415, the Court of Appeal observed that, "[i]n our society, those who mistreat animals are the deserved object of obloquy, and their conduct is wrongful of itself and not just as a matter of legislative declaration." An example of such "legislative declaration" regarding the mistreatment of animals may be found in the enactment of section 597(b), which proscribes specified acts and omissions that are the product of grossly negligent conduct and are deemed to be acts of animal cruelty or neglect. (See *Speegle, supra*, at pp. 1412–1415.)

As pertinent here, and with exceptions not applicable in this case, section 597(b) provides: "[E]very person who . . . deprives of necessary sustenance, drink, or shelter . . . any animal, or causes . . . any animal to be so . . . deprived of necessary sustenance, drink, shelter . . . ; and whoever, having the

charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or . . . fails to provide the animal with proper food, drink, or shelter or protection from the weather, . . . is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000)."

Riazati acknowledges that criminal liability under section 597(b) may be imposed on a person who has custody of, or is responsible for providing care to, an animal and commits an act or omission proscribed by that subdivision that recklessly exposes the animal to a high risk of *death*, as the court properly instructed the jury in this case. In *Speegle, supra*, 53 Cal.App.4th at pages 1412–1413, the Court of Appeal upheld an instruction (which was also given in the instant case) that " '[s]ubjecting an animal to needless suffering and failure to provide an animal with proper food, drink or shelter are both unlawful [under section 597(b)] when a person . . . commits an act or omission which would inherently produce danger to an animal's *life*.' " (Italics added.)

█ *Speegle*, however, did not address the issue of first impression presented here of whether criminal liability under section 597(b) may be imposed on a person who has custody of, or is responsible for providing care to, an animal and commits an act or omission proscribed by that subdivision that recklessly exposes the animal to a high risk of *great bodily injury*. We conclude that criminal liability may be imposed on such a person under section 597(b). Nothing in the language set forth in section 597(b) indicates a legislative intent to proscribe grossly negligent conduct that exposes an animal under a person's care to a high risk of death, but to shield that same person from criminal liability for engaging in grossly negligent conduct that exposes the animal to a high risk of great bodily injury. On the contrary, as pertinent here, the statute is broadly written to encompass grossly negligent conduct that "deprives [any cared-for animal] of necessary sustenance, drink, or shelter," or "causes . . . any animal to be so . . . deprived of necessary sustenance, drink, [or] shelter," or "subjects any animal to needless suffering." (§ 597(b).) █ As a practical matter, and as a matter of common sense and experience, great bodily injury to an animal is often the precursor to the animal's death. Thus, an interpretation of section 597(b) permitting the imposition of criminal liability for grossly negligent conduct that exposes a cared-for animal to a high risk of great bodily injury is consistent with the Legislature's judicially recognized intent to protect such animals from grossly negligent conduct that exposes them to a risk of death. (See *Speegle, supra*, 53 Cal.App.4th at pp. 1412–1413; *People v. Youngblood* (2001) 91 Cal.App.4th 66, 70 [109 Cal.Rptr.2d 776].) In this regard, we emphasize that the risk of great bodily injury to an animal created by the allegedly culpable conduct of defendant must be a high risk. Stated differently, the risk of great bodily

injury to the cared-for animal created by defendant's alleged gross negligence, in order to support a conviction for animal cruelty or animal neglect under section 597(b), must be a high risk.

In sum, we conclude the court did not commit instructional error or violate Riazati's rights to due process and a fair trial.

## II. *SUFFICIENCY OF THE EVIDENCE (COUNTS 1–6)*

Riazati also contends the evidence is insufficient to support any of his six section 597(b) animal neglect convictions because there is no evidence he "failed to properly provide food, water, or shelter to the six species of animals under his care in a manner that created a high risk of death" to the animals, and thus there is no evidence he acted with the gross negligence required for a conviction under section 597(b). This contention is unavailing.

### A. *Applicable Legal Principles*

When assessing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review, under which we view the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that any reasonable trier of fact could find the essential elements of the charged crime or allegation proven beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

"The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123].) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

### B. *Analysis*

In both his opening and reply briefs, Riazati maintains there is no evidence that he acted with the gross negligence required for a conviction under section 597(b) because there is no evidence his actions were likely to kill the animals or created a high risk of death. Riazati's insufficiency of the evidence claim is unavailing because it is based on the false premise that each of his six section 597(b) animal neglect convictions must be reversed unless it is supported by

substantial evidence that he recklessly failed to provide proper food, water, or shelter to the six species of animals under his care in a manner that created a high risk of *death* to the animals. We have already concluded that criminal liability under section 597(b) may be imposed on a person who has custody of, or is responsible for providing care to, an animal and commits an act or omission proscribed by that subdivision that recklessly exposes the animal to a high risk of *great bodily injury*. Riazati does not claim on appeal, and makes no attempt to demonstrate, that there is no substantial evidence to show he recklessly failed to provide proper food, water, or shelter to the animals under his care in a manner that created a high risk of *great bodily injury* to the animals. Thus, he has failed to meet his burden as the appellant of showing the evidence is insufficient to support his convictions.

Even if Riazati had made such a claim, there is ample substantial evidence in the record (as summarized in greater detail in the factual background, *ante*) to support each of his convictions. Here, as in *Brian, supra,* 110 Cal.App.3d Supp. 1, in which the appellate department of the superior court affirmed the section 597(b) animal neglect conviction of the owner of three horses, several dogs, cats, goats, and some fowl, there is substantial evidence that animals under his care were "in a thin and dehydrated condition due to a shortage of food, water, shelter and protection from the weather." (*Brian, supra,* at p. Supp. 3.)

For example, the prosecution's expert witness (Department Veterinarian Maher)—who examined all of the animals seized from Riazati's home on April 16 after many attempts (starting on Feb. 28) by Department officers to persuade Riazati to correct the deplorable living conditions of his animals—testified that a German Shepherd was thin and had hair loss around the tail, indicating malnutrition and exposure to dirty conditions; a Chow puppy was suffering from pneumonia, was very thin and underweight, had lost the muscle mass along its spine, and had no palpable fat; the rabbits and guinea pigs were underweight and suffering from dehydration; the birds had inadequate food that was covered with bird droppings, and their water was also contaminated with feces, which can transmit diseases; the duck was emaciated and covered with feces, and had no shelter or bathing water; and the chicken was emaciated and starving.

In sum, we conclude the evidence is sufficient to support all six of Riazati's section 597(b) animal neglect convictions, one count for each species of animal found in his possession and under his care, because the prosecution presented substantial evidence from which any reasonable trier of fact could find beyond a reasonable doubt that his acts and omissions recklessly created a high risk of great bodily injury to the animals. Accordingly, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 27, 2011, S193047. Werdegar, J., did not participate therein.