Filed 9/15/16  P. v. Van Dusen CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAN ELIZABETH VAN DUSEN,<br><br>    Defendant and Appellant. | A142665<br><br>(Alameda County<br>Super. Ct. No. 169934) |

Defendant was convicted of felony animal cruelty.  (Pen. Code, § 597, subd. (b).)[1]
She challenges the sufficiency of the evidence and the trial court's decision to treat the
"wobbler" offense as a felony.  We affirm.

### BACKGROUND

Defendant came to the attention of Oakland Animal Services (Animal Services) in
2009, when a neighbor complained she was keeping large numbers of cats.  At that time,
Animal Services visited defendant's house and found she had about 50 cats, but found
they were clean and well cared for.

The next year, in response to new complaints, Animal Services returned and found
defendant had acquired more cats—for a total of 60 to 70.  It also found the cats were no
longer as healthy.  Animal Services had concerns about the spread of ringworm, which
some of the cats already had, giardia, and FIV (feline immunodeficiency virus).

With defendant's consent, Animal Services took several of the healthy, tame cats
for adoption.  Additionally, defendant signed an agreement promising she would not take

---

[1] All further statutory references are to the Penal Code unless noted.

on any more cats. To ensure proper care of the cats defendant was keeping, an Animal Services veterinarian gave defendant several guidelines: There should be no more than 60 cats; the cats should be kept in groups of 10 to reduce infectious disease and stress; each should have "one meter triangulated" of space between food, water, and bedding; each should receive deworming medication and vaccinations; and special procedures should be followed in response to giardia and ringworm outbreaks.

By 2011, the situation had worsened. Animal Services learned defendant was taking on new cats in breach of her agreement. Indeed, defendant concedes this, admitting she took in seven new cats in June 2011, cats which were a vector for a diarrhea problem. The diarrhea problem escalated, and in asking a cleaner to help address the mess on October 4, 2011, defendant described her home as "a house of horrors." When this cleaner arrived almost three weeks later, on October 23, 2011, what he saw compelled him to contact Animal Services.

The cleaner saw "feces everywhere," some dry, some fresh, some liquid—it covered the floor, cages, and litter boxes. Towels meant to be bedding were soaked in it. Many cats were sitting in their own feces and did not look well. Some cats were stuck in cages with their own excrement. Some cats were very skinny and reacting as if they were weak. Two cats were splayed out on top of a stove and appeared as if they were "barely moving" and "slowly dying." Ammonia from cat urine stung the cleaner's eyes and caused an overpowering smell. He had to step outside from time to time to catch a breath of fresh air.

The cleaner took digital photographs of defendant's home and contacted police.

Meanwhile, defendant had a friend clean part of her house on October 24 (mopped, changed litter boxes, replaced water), but when the friend returned on October 26 to do additional cleaning, the cleaned part of the house was dirty again. The friend cleaned part of the house again, but simply had to stop. The friend had not been to defendant's house for nine months before October 24 and was appalled by conditions she found. She thought cleaning would be required every single day just to make the place livable. It was not a safe place for cats.

2

The next day, October 27, Oakland Police executed a search warrant. The officers, accompanied by Animal Services, observed conditions similar to what the cleaner had documented on the 23d. Feces were everywhere, including several feet up the walls. Urine was "covered almost like water everywhere." Cat cages were stacked and laden with dripping feces. There were too few litter boxes, forcing cats to either use the floor or a feces-laden box. A cat could not move throughout the house without stepping in excrement. These conditions promoted the spread of disease. The disease problem was obvious to a shelter expert, and he faulted defendant for not addressing the problem.

Food and water were available to the cats, but only in large, central buckets that, according to some of the experts, made it difficult for the weaker, sicker cats to get access and nourishment. The water did not look fresh.

Rather than the 60 cats defendant agreed to keep, there were over 93 live ones. The large number not only created monitoring problems for a caregiver who had to assure proper nourishment and health, but it created stress amongst the cats unable to get space and unable to determine their social structure. According to one shelter expert, a staff of 10 would have been required to properly care for the cats in defendant's home. That expert also believed the conditions at the house could not have developed over just a day, but had to have been ongoing, given the visibly poor health of the cats.

It was clear to Animal Services that the cats were troublingly sick and needed to be removed from defendant's care. All 93 live cats were seized, in addition to 11 dead cats.

The dead cats were found one per plastic bag in a freezer. Many had ocular discharge suggesting infection, were stained with diarrhea, had hair loss and raw skin suggesting a prolonged bout of diarrhea, suffered from various oral ulcerations, and were severely emaciated. These conditions could not have developed overnight.

The living cats were examined at Animal Services. All required some medical treatment. Ten required urgent medical care. Seven were so severely sick they were euthanized after an initial assessment; another 11 had to be put down after treatment

3

failed. Fifty-eight had fleas, 49 had ear mites, 44 had dental disease, and 32 had respiratory infections. Some had discharge from their eyes or noses, hair loss, and skin inflammation. The cats should have been treated for fleas and ear mites with readily available, over-the-counter products, but clearly were not being treated. Dental disease and the respiratory infections required veterinary attention, but none was being sought. Dental disease in particular is painful and can take months or years to develop. Additionally, many of the cats were severely emaciated, "just like little skeletons," and required medical attention. In sum, the living cats, according to one expert, were needlessly suffering from conditions that should have been treated long before Animal Services seized the felines. Given the state of defendant's house and the cats, the cats were likely suffering for weeks or months.

In defense, defendant put on evidence she was long involved in the cat rescue community and the conditions at her house in October 2011 were not representative. For years, defendant practiced TNR (trap, neuter, return), but often would encounter cats she believed could not be safely returned, because they were too old or sick, and she would keep these. Several friends testified that though defendant collected many cats, her house was extremely clean. They also testified defendant was doing her best to manage the escalating situation despite having work, as a trial attorney, that kept her away from home starting the night of Sunday, October 23.

A veterinarian testified many of the conditions the cats suffered were not as serious as the prosecution's witnesses contended. Fleas were ubiquitous, mites were an annoyance, and diarrhea often abates after time without treatment. The veterinarian testified defendant's free feeding setup did not deprive the cats of food. Yet the veterinarian conceded, on cross-examination, a house matching the description of defendant's in late October was not a proper or safe shelter for the animals.

Defendant testified she went to a veterinarian three times to try to diagnose the diarrhea outbreak, but got no definitive answer. She was administering medication to the cats in September but did not have enough for her entire "herd." That extra medication arrived on October 22, 2011, but was never administered because of intervening events.

4

The Alameda County District Attorney charged defendant with one count of felony animal cruelty. (§ 597, subd. (b).) A jury heard the case but was "hopelessly deadlocked" and the trial court declared a mistrial. The People sought a new trial for which defendant waived her right to a jury. The court found defendant guilty and denied a section 17, subdivision (b) motion to reduce the conviction to a misdemeanor. The court placed defendant on five years of probation. Defendant appealed.

## DISCUSSION

### *Sufficiency of the Evidence*

"When assessing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review, under which we view the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that any reasonable trier of fact could find the essential elements of the charged crime or allegation proven beyond a reasonable doubt." (*People v. Riazati* (2011) 195 Cal.App.4th 514, 532 (*Riazati*).) "We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses" and the testimony of even " 'a single witness is sufficient to sustain a conviction.' " (*Ibid.*)

Defendant was charged with animal cruelty under section 597, subdivision (b).[2] This statute "is broadly written to encompass grossly negligent conduct that 'deprives [any cared-for animal] of necessary sustenance, drink, or shelter;' or 'causes . . . any

_____

[2] The statute provides: "[E]very person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for each offense, guilty of a crime . . . ." (§ 597, subd. (b).)

5

animal to be so . . . deprived of necessary sustenance, drink, [or] shelter;' or 'subjects any animal to needless suffering.' " (*Riazati*, *supra*, 195 Cal.App.4th at p. 531, quoting § 597, subd. (b); *People v. Youngblood* (2001) 91 Cal.App.4th 66, 72 (*Youngblood*).)

The statute punishes gross, or criminal, negligence. (*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1411, 1415 (*Speegle*), agreeing with *People v. Brian* (1980) 110 Cal.App.3d Supp. 1, 4; *People v. Brunette* (2011) 194 Cal.App.4th 268, 284.) To be criminal, an accused's negligence " ' "must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to [show] indifference to [the relevant] consequences." ' " (*Brunette, supra*, at p. 285 [addressing the animal cruelty statute]; see *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754 [gross negligence is a " ' " 'want of even scant care' " ' or ' " 'an extreme departure' " ' "].) An accused's negligence must not merely present an unreasonable risk of harm (as required for ordinary negligence), but a higher degree of risk. (*Brunette*, at p. 285; see *Riazati*, *supra*, 195 Cal.App.4th at pp. 530–532.)

One formulation of the standard requires "such a gross departure from the reasonably prudent that it amounts to reckless indifference with actual or imputed knowledge of the consequences." (*Speegle*, *supra*, 53 Cal.App.4th at pp. 1414–1415, fn. 7.) Another formulation requires an " 'exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204.) Despite the mention of presumed "conscious" indifference, the test for criminal negligence remains an objective one: that is, whether a reasonable person in defendant's shoes would have been aware of the risk. (*Ibid.*; *Speegle*, at p. 1411 [animal cruelty statute not unconstitutionally vague because criminal negligence is measured by an objective standard of reasonableness].)

Defendant contends there is insufficient evidence she was consciously indifferent about the cats' well-being. Defendant's subjective belief she was not harming, but even helping the cats, however, is not germane if there is evidence she should have been aware

6

her conduct was a severe departure from a standard of reasonable care and created a high risk of harm.

There is substantial evidence defendant should have been so aware. The expert testimony provided evidence of death, harm, and suffering endured by some 100-plus cats, and provided evidence the deplorable conditions at defendant's home likely existed for weeks, if not months, before the cleaner's visit on October 23 and the law enforcement visit on the 27th.[3] Defendant, herself, described her home as a "house of horrors" on October 4, some three weeks earlier. She also conceded the diarrhea situation had become serious in September, when she needed diarrhea medication for her entire "herd." Moreover, in 2010, Animal Services had given defendant specific guidelines as to the appropriate handling of cats and she had agreed not to have more than 60 cats. Yet, defendant egregiously defied Animal Services, taking in nearly two times that number and failing to house them appropriately.

Thus, to any reasonable person the risks of her behavior would have been patently clear. Indeed, cats were dying (11 died), required euthanization (18 were put down), and were suffering from numerous ailments tied to the horrendous conditions at defendant's home. In short, overwhelming evidence supports the court's finding that defendant was criminally negligent in not caring for the cats. (See *Riazati*, *supra*, 195 Cal.App.4th at p. 532; *Youngblood*, *supra*, 91 Cal.App.4th at p. 72.)

***Felony Punishment Is Appropriate***

"The Legislature has classified most crimes as either a felony or a misdemeanor, by explicitly labeling the crime as such, or by the punishment prescribed. 'A felony is a crime that is punishable with death, [or] by imprisonment in the state prison . . . . Every

---

[3] Thus, the trial court was not compelled to accept defendant's contention that the conditions the week of October 23 were unusual. Nor did the trial court have to credit testimony that defendant tried to handle the situation that week by hiring cleaners. And even if credited, the presence of cleaners in late October does not explain defendant's failure to address the deplorable situation sooner. Rather, it shows defendant let things get so far out of hand that even cleaners spending hours at a time could clean only a part of the mess the cats were making.

other crime or public offense is a misdemeanor except those offenses that are classified as infractions.' (§ 17, subd. (a).) There is, however, a special class of crimes involving conduct that varies widely in its level of seriousness. Such crimes, commonly referred to as 'wobbler[s]' [citation], are chargeable or, in the discretion of the court, punishable as either a felony or a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine. (§ 17, subd. (b); [citation].)" (*People v. Park* (2013) 56 Cal.4th 782, 789, italics omitted, fn. omitted (*Park*).) Section 597, subdivision (b), is a wobbler. (§ 597, subd. (d).)[4]

When a crime is a wobbler, and when the trial court, as here, chooses to grant probation without imposition of sentence, the trial court may declare the crime to be a misdemeanor. (§ 17, subd. (b)(3).) The declaration is discretionary with the trial court (*Park*, *supra*, 56 Cal.4th at p. 790) and our review is for abuse of discretion (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 (*Alvarez*)).

" 'Discretion is compatible only with decisions "controlled by sound principles of law, . . . free from partiality, not swayed by sympathy or warped by prejudice . . . ." [Citation.]' [Citation.] '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*Alvarez, supra*, 14 Cal.4th at p. 977.)

Further, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither

---

[4] A violation of section 597, subdivision (b) "is punishable as a felony by imprisonment pursuant to subdivision (h) of Section 1170, or by a fine of not more than twenty thousand dollars ($20,000), or by both that fine and imprisonment, or alternatively, as a misdemeanor by imprisonment in a county jail for not more than one year, or by a fine of not more than twenty thousand dollars ($20,000), or by both that fine and imprisonment." (§ 597, subd. (d).)

authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " (*Alvarez, supra*, 14 Cal.4th at pp. 977–978.)

A trial court may consider " 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or [her] traits of character as evidenced by [her] behavior and demeanor at the trial.' " (*Alvarez, supra*, 14 Cal.4th at p. 978 & fn. 5.) It may also consider the general objectives of sentencing set forth in California Rule of Court, rule 4.10: protection of society, punishment, specific and general deterrence, restitution, and uniformity. (*Alvarez*, at p. 978 & fn. 5.)

Defendant maintains the trial court abused its discretion because it did not appreciate that a felony conviction would "almost certainly depriv[e] [her] of her bar license." While Business and Professions Code section 6102 states a felony conviction is cause for attorney discipline, it also makes clear that reducing a felony to a misdemeanor under section 17, subdivision (b)(3), does not affect the status of the crime as a felony for purposes of the disciplinary procedures. (Bus. & Prof. Code, § 6102, subd. (b).) Thus, defendant is subject to the same disciplinary proceedings, whether or not her conviction offense is denominated a felony or misdemeanor. (See *Park, supra*, 56 Cal.4th at p. 794 [an attorney guilty of "a wobbler charged as a felony is deemed convicted of a felony and subject to immediate suspension from the practice of law, even if the offense has been reduced to a misdemeanor pursuant to section 17[, subdivision] (b)(1) or (b)(3)"]; *Gebremicael v. California Com. on Teacher Credentialing* (2004) 118 Cal.App.4th 1477, 1486.)

As to the trial court's conclusion that the evidence showed the degree of negligence required for felony punishment, we cannot say it was beyond the bounds of reason. The court considered defendant's otherwise crime-free record, her asserted intention to help the rescued cats, and the efficacy of misdemeanor sentencing. It also considered the severity of defendant's neglectful conduct after having heard all the evidence as fact finder and decreed "if this case of neglect does not amount to felony misconduct, then I just simply don't know what does."

9

That the trial court, while ruling on defendant's section 17 motion, referenced comments it made during pronouncement of verdict—comments to the effect that defendant's conduct was felonious—does not mean it was irrationally hamstrung by or wedded to those earlier comments. Rather, the trial court viewed defendant's conduct in a consistent manner, saying it "still" believed the conduct should be deemed felonious.

**DISPOSITION**

The judgment is affirmed.

_____

Banke, J.

We concur:


_____

Margulies, Acting P. J.


_____

Dondero, J.

A142665, *People v. Van Dusen*

11