Filed 4/27/15  P. v. Adams CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>KAREN M. ADAMS,<br><br>　　　Defendant and Appellant. | D065680<br><br><br><br>(Super. Ct. No. SCN309924) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael J. Popkins, Judge.  Affirmed in part; reversed in part.

Rex A. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Martin E. Doyle for Plaintiff and Appellant.

I.

INTRODUCTION

A jury convicted Karen M. Adams of five counts of misdemeanor animal cruelty (Pen. Code, § 597, subd. (b))[1] and one count of failing to obtain a kennel license (San Diego County Code, § 62.641).[2] The trial court suspended imposition of sentence and placed Adams on summary probation for three years. Adams contends that the convictions for animal cruelty must be reversed because (1) there was no substantial evidence that she engaged in criminally negligent acts or omissions that caused a high risk of great bodily injury or death, and (2) the court prejudicially erred by failing to instruct the jury sua sponte that a conviction under section 597, subdivision (b) requires a finding that the defendant created a high risk of death or great bodily injury. We reverse the animal cruelty convictions on the ground that the evidence is insufficient to support them.

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

[2]     The subject of each of the five counts of animal cruelty is a dog that the San Diego Humane Society (the Humane Society) removed from Adams's residential property. The Humane Society assigned each dog a number, and the verdict form for each count referred to the dog by its number and name. By name, the subject dogs are Rex (count 1), Lido (count 2), Friki Tavi (count 3), Oatie (count 4), and Bayer (count 5).

2

II.

FACTS[3]

A.    *Prosecution evidence*

Erika Monreal, an investigative officer with the San Diego Humane Society, and other law enforcement officers, executed a search warrant on Adams's residence in Bonsall on September 6, 2012.  Monreal entered a bathroom in the main house on the property through an unlocked window.  The bathroom was extremely filthy and smelled strongly of feces and urine, and a brown substance was splattered all over an interior doorway.  Two dogs, Rex and Lido, were locked in the bathroom.  There was no food in the bathroom, but there was water for the dogs in a red bucket, and the toilet seat was open.

Monreal described Rex's demeanor as "aggressive" because he was barking and growling with his eyes locked on the officers.  The officers used a catchpole[4] to remove Rex from the house.  Rex had several areas of missing or thinning hair and his face was swollen.  There was green discharge coming from one eye, his paws were swollen, and

---

[3]    Because Adams does not raise any issues on appeal regarding her conviction for failing to obtain a kennel license in violation of San Diego County Code section 62.641, we omit discussion of the facts underlying that offense.

[4]    A catchpole is a long metal pole that has an adjustable loop at one end.  The loop is placed over the dog's head and tightened around its neck.  Monreal explained that a catchpole "is used to create distance between . . . an officer and an animal that could be potentially aggressive."

there was red, raw skin on his right front paw.  He had a very strong odor that Monreal described as being "a combination between a wet, dirty dog smell and yeast."

Lido had the same aggressive demeanor and strong odor that Rex had.  Lido had lost most of his fur, had red, inflamed skin, and his body was covered with scabs.  His paws were swollen and his nails were overgrown.  There was a white discharge coming from an eye and the tip of his nose was bleeding.  Officers used two catchpoles to remove Lido because when they put the first one on him, he began to "thrash around and it was very hard to control [him] so a second catchpole was placed for . . . better control."

The officers crated Rex and Lido and were waiting for a veterinarian to arrive to examine the dogs when Adams arrived on the property.  Adams assisted Monreal in removing 10 additional dogs from the main house.  Monreal testified that the majority of the dogs "were all in good weight and condition" and "looked really healthy."  However, one of the dogs, Friki Tavi, was missing patches of hair and had raw and scaly skin and overgrown nails.

After inspecting the dogs that were removed from the main house, Monreal entered a second house on the property and observed seven dogs in that house.  All of those dogs "appeared bright, alert, and responsive, in good weight and condition."

Monreal next entered a shed that "had two really large rooms in it."  There was a stench in the shed that smelled like urine and feces and "almost smelled like a sickness."  The stench was "overpowering to the point where [Monreal] had to walk out."  The first room in the shed was "very filthy."  The floor of the second room appeared to be stained

4

with old feces and urine, and there were two wire crates in that room. One crate contained one dog and the other crate contained two dogs. Two other dogs were roaming freely outside the crates. There were approximately 30 pieces of "kibble"—i.e., "little bits of dog food"—"thrown everywhere," and there was a pile of feces on the floor. There was adequate water for the dogs in the room. A bucket of water was accessible to the two dogs that were roaming freely, and there was a bucket of water in each of the crates.

Oatie and Bayer were the two dogs that were together in one of the crates. The dogs were sitting on the floor wiring of the crate. There was water, but no food in the crate, and there was diarrhea at one end of the crate. Oatie had patches of hair missing under his neck and inflammation in the area of his nose. He also had a mild "yeasty, wet-dog smell." Bayer appeared to be healthier than Oatie, "meaning most of his hair was intact." Bayer had "[n]o discharge, no scabby skin, no overt smell."

The officers found 65 animals, including 27 dogs, on Adams's property and removed eight dogs from the property. Monreal "decided to take only the most sickly looking dogs for their health and safety." Lido died on December 24, 2012, more than three months after the execution of the search warrant, while in the custody of the Humane Society.

Dr. James Ransom, a staff veterinarian with the Humane Society, was present when the officers executed the search warrant on Adams's property, and he examined the confiscated dogs. He testified that "[a]ll of the dogs on the property were extremely

5

scared, unhandleable," and that the confiscated dogs remained "unsocialized" and "unhandleable" at the time of trial. Dr. Ransom diagnosed Rex as having severe otitis externa, a type of ear infection, and demodecosis, a skin infection caused by a mite that lives on the skin. On severely stressed animals, the mite can "overgrow and flourish" causing extensive hair loss and, in severe cases, skin infections. The amount of hair loss that Rex suffered indicated that his demodecosis was severe. Dr. Ransom testified that it is "uncommon to see that amount of hair loss unless it's a stray animal or an animal that's severely stressed or an animal that has some sort of autoimmune problem."

Dr. Ransom characterized the discharge coming from Rex's eye as a mucopurulent discharge caused by an eye infection. He testified that eye infections are caused by stress and "bacterial overgrowth." He explained that stress can also be a factor in causing ear infections in dogs, "[b]ut most often . . . it's a dirty ear that hasn't been cleaned properly and so the environment becomes very moist and warm. And that's the perfect environment for bacteria to grow." An ear infection could cause a dog to lose its hearing in a "worse-case scenario."

Dr. Ransom treated Rex's infections with antibiotics. He testified that the infections could have become painful and stressful for Rex and resulted in a low quality of life if they had gone untreated. Regarding Rex's overall condition, Dr. Ransom testified that "these conditions themselves aren't life threatening. They can be in severe instances. But typically these dogs . . . get to a certain point where they look absolutely

6

horrible and you could argue that they're suffering, but . . . their lives aren't necessarily at risk from this."

Dr. Ransom examined Lido and diagnosed him as also having severe otitis and dermatopathy—i.e., a "generalized skin problem." On a scale of one to 10, Lido's dermatopathy was between eight and a half and nine, and Rex's was seven or eight. Dr. Ransom testified that "hypothetically," keeping Rex and Lido in an enclosed bathroom that smelled heavily of urine and feces and had either feces or blood splattered on the wall would not be conducive to their health because "keeping the external environment as clean as possible is going to help them get healthier faster."

Lido had open skin abrasions on his face, back, belly, and feet, and pododermatitis, an inflammation of his paws that caused severe hair loss. Dr. Ransom treated Lido with ivermectin, an anti-parasite medication.[5] Lido died as the result of severe pneumonia while he was in the Humane Society's custody. Dr. Ransom was asked at trial whether Lido's pneumonia was connected to his condition at the time he was impounded. He answered, "It could have been. As I said previously, all of these dogs are extremely poorly socialized and so they're very, they're constantly stressed. [¶] In a shelter environment we have a lot of upper respiratory pathogens and diseases that are present. So . . . every once in a while we have a dog that's severely stressed [that]

---

[5]     Dr. Ransom testified that Lido was "on ivermectin every day for a period of six months." However, Lido died on December 24, 2012, less than four months after the Humane Society impounded him. Presumably, Dr. Ransom either confused Lido with Rex or another dog, or he was mistaken about the length of time that Lido was treated with ivermectin.

gets . . . a routine virus. And as a result[,] that virus—that infection becomes more severe and the dog can [actually] pass away."

When Dr. Ransom was asked whether he could tell how long Rex and Lido had been suffering from "their ailments," he responded that it "would have been a period of anywhere from a month plus," but "most likely it was a lot greater than a month. [It had] probably been three, four, five months, maybe longer."

Friki Tavi also suffered from pododermatitis, and was treated with antibiotics, ivermectin, ear cleaning, and ear medication. Friki Tavi was doing well medically at the time of trial. His hair had grown back, he no longer had an ear infection and he looked much healthier than he did when he was impounded. Dr. Ransom rated Friki Tavi's condition when he was impounded as eight on a scale of one to 10, with 10 representing the worst possible condition. He testified that Friki Tavi's symptoms could have been prevented with "[a]ppropriate husbandry, good care."

On the day that the subject dogs were impounded, Dr. Ransom entered the shed where Oatie and Bayer were found. He observed that the shed was dirty and that the wire crate that the dogs occupied was "small . . . for two dogs to be kept in long term." There were feces and urine "everywhere" and there was either feces or dirt in the dogs' water. The environment was not conducive to the dogs' health. The type of diarrhea he observed under the crate typically indicates stress.

At the time Oatie was removed from Adams's property, he suffered from severe dermatopathy and an ear infection. Dr. Ransom rated Oatie's condition as eight on a

8

scale of one to 10. Like the other dogs, he was treated with antibiotics, ivermectin, and ear medications. He was doing well medically at the time of trial, but was not doing well socially. His condition was preventable.

Compared to the other dogs impounded from Adams's property, Bayer looked the best. He had some hair loss and was difficult to handle socially, but he did not have the same level of hair loss, skin inflammation, or ear infection that the other dogs had. A fecal examination revealed that Bayer had hookworms and whipworms. Dr. Ransom testified that hookworms are uncommon gastrointestinal parasites that tend to grow and flourish in highly stressed animals or animals with poor husbandry and improper nutrition. They are "more of a soil type parasite," and a "soil-based environment or a very, very dirty environment" can contribute to their presence. In severe cases, hookworms can cause an animal to become anemic. Whipworms are similar to hookworms, and are also usually found outside in the soil. They pass from dog to dog through feces and are typically the result of poor husbandry, an unclean environment, or a large number of dogs being kept in a particular area.

Dr. Ransom testified that the "illnesses" that all five dogs suffered could have been prevented with routine care and proper husbandry, and by putting them on appropriate medications when they showed signs of illness, before their conditions "got to the point that they were at when we found them." On redirect examination, Dr. Ransom testified that if the dogs had been given the proper medications for their ailments in the environment in which they were found on Adams's property, it was unlikely that they

9

would have recovered because "[a] major tenant [*sic*] of good medical care is a clean environment, proper sanitation." Dr. Ransom explained that if the dogs were treated in a dirty environment in which the infectious organisms were still present, their ailments would "keep coming back."

B. *Defense evidence*

Adams testified in her defense. She estimated that that she has taken in 200 adult dogs over the last 10 years. She attempts to find people to adopt the dogs that she takes in, but lets the unadoptable dogs "stay at [her] house until their life is over." She testified that she tries to help dogs on her own before taking them to a veterinarian, but she will take a dog to a veterinarian when the dog is in obvious need of medical attention, and maintained that she knows when she "need[s] a vet."

A family brought Rex to Adams about three or four months before he was impounded in September 2012. When the family brought Rex to Adams, he had almost no fur and "was kind of bloody." The same family brought Lido to Adams a month to six weeks before he was impounded. Lido was almost completely hairless when Adams received him. Adams treated Rex and Lido with betadine on their open wounds and treated Rex for "demodex mites" with "a dip" and ivermectin.[6]

Adams received Friki Tavi four to six months before September 2012 from some people who had lost their home. Adams's daughters found Bayer in a nature preserve

---

[6] Adams testified that the brown spatter on the walls of the bathroom where Rex and Lido were found was betadine that she had sprayed on their open wounds.

10

next to Adams's property approximately six months before he was impounded. Adams "posted signs and ads to see if someone would claim him." She treated Bayer with "a holistic method of treating for worms and parasites . . . ." Adams found Oatie "just running around on [her] street" approximately one year before he was impounded. He was completely hairless and had demodectic mange. Adams treated him immediately with ivermectin.

Adams testified that she never crated any animal or left any animal in the bathroom for more than four hours. The dogs that she put in crates when she had to leave her property typically spent about 30 minutes a day in a crate.

Adams's 20-year-old daughter, Kali, testified that she lived in a separate house on Adams's property. She had seen her mother take in dogs and care for them for as long as she could remember. Her mother took the dogs to the veterinarian, fed them, cleaned them, and made sure they were healthy. Kali estimated that her family had taken in between 80 and 100 dogs over the course of her lifetime. Of the eight dogs that the Humane Society impounded, five of them had a skin disease that Adams had treated with medication since she took them in. Kali testified that the dogs were put in "the kennels" whenever no one was home, but were otherwise not kept in the kennels. Her mother did not leave the house often. Oatie and Bayer were put in their crate when no one was home. When Kali was asked if sometimes she, her mother, and her sister were all away from home, she answered, "Hardly ever."

11

Kali never let the dogs stay with their own feces overnight in the room where Bayer and Oatie were crated. Her daily chores on the property included feeding and watering animals, cleaning out their cages, and picking up their feces multiple times.

Adams's daughter, Kathryn, testified that she lived with her sister Kali in the separate house from the one her parents lived in on the same property. She had also helped care for the dogs that the Humane Society confiscated, including feeding them, giving them water, helping with their medications, and letting them outside and playing with them.

III.

DISCUSSION

A.    *Sufficiency of the Evidence to Support the Animal Cruelty Convictions*

Adams contends that her convictions on the five counts of animal cruelty must be reversed because the prosecution did not present substantial evidence that she committed any act or omission that placed the subject dogs at a high risk of death or great bodily injury.

In reviewing whether substantial evidence supports a conviction, " '[t]he appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' . . . Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]

12

"In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent. . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "[n]ot every surface conflict of evidence remains substantial in the light of other facts." ' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

"When . . . the trier of fact has relied on inferences, those inferences must be reasonable." (*People v. Holt* (1997) 15 Cal.4th 619, 669.) An inference is not reasonable if it is " ' "based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

Adams was convicted of five counts of violating section 597, subdivision (b), which provides, in relevant part: "[E]very person who . . . tortures, torments, deprives of necessary sustenance, drink, or shelter, . . . or causes or procures any animal to be

13

so . . . tortured, tormented, deprived of necessary sustenance, drink,[ or] shelter, . . . ; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather . . . is, for each offense, guilty of a crime . . . ."

The appellate court in *People v. Brian* (1980) 110 Cal.App.3d Supp. 1 (*Brian*) held that a conviction for violating section 597, subdivision (b), requires proof of criminal negligence. (*Brian, supra,* at pp. 3-4; accord, *People v. Brunette* (2011) 194 Cal.App.4th 268, 284 ["[C]riminal negligence is the minimum, i.e., least culpable mental state for convictions under subdivision (b) of section 597 and subdivision (a) of section 597.1"].)[7] In *People v. Speegle* (1997) 53 Cal.App.4th 1405 (*Speegle*), the court stated

---

[7] The *Brian* court disagreed with *People v. Farley* (1973) 33 Cal.App.3d Supp. 1 (*Farley*), in which the court held that a conviction for violating section 597, subdivision (b) "requires proof of negligence, but not more . . . ." (*Farley, supra,* at p. 9.) The *Brian* court explained that *Farley*'s holding was based on cases that held that the intent element for a violation of section 273a, an analogous statute involving child endangerment, was ordinary negligence. (*Brian, supra,* 110 Cal.App.3d at p. 4.) *Brian* noted that those cases "[had] been weakened in their persuasiveness, since *Farley* was decided, [by] *People v. Peabody* (1975) 46 Cal.App.3d 43 [(*Peabody*)] . . . ." (*Brian, supra,* at p. 4.) Based on section 20, which provides that "[i]n every crime or public offense there must exist a union, or joint operation of act and intent, or *criminal* negligence" (italics added), and California Supreme Court cases, the *Peabody* court held that a conviction under section 273a " 'requires proof of criminal negligence which means that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life.' " (*Brian, supra,* at p. 4, quoting *Peabody, supra,* at pp. 48-49.) The *Brian*

14

that the *Brian* court had "considered the proper principles in connection with the necessary mental state [for a conviction under section 597, subdivision (b)]." The *Speegle* court accordingly held that a conviction for animal neglect in violation of section 597f also requires proof of criminal negligence because there is no "credible basis for concluding section 597f is distinguishable from section 597 as interpreted by *Brian* . . . ." (*Speegle, supra,* at p. 1415.)

Criminal or gross negligence is defined in the CALCRIM jury instructions as follows: "*Criminal* [*or gross*] negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal [or gross] negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury. [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal [or gross] negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] [*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.]" (CALCRIM No. 582.)[8]

---

court directed the trial court on retrial to "instruct the jury . . . with a paraphrase of the definition of criminal negligence from *People v. Peabody* . . . so that it applies to animals, not children." (*Brian, supra,* at p. 5.)

[8] The definition of "gross negligence" in the CALCRIM instructions is identical to the definition of "criminal negligence." (See CALCRIM Nos. 580-582 (criminal

As authority for this definition of criminal or gross negligence, the CALCRIM instructions cite, among other cases, *People v. Rodriguez* (1960) 186 Cal.App.2d 433, 440, in which the court stated in connection with involuntary manslaughter: "It is generally held that an act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm. The risk of death or great bodily harm must be great. [Citation.] Whether the conduct of defendant was wanton or reckless so as to warrant conviction of manslaughter must be determined from the conduct itself and not from the resultant harm. [Citation.] Criminal liability cannot be predicated on every careless act merely because its carelessness results in injury to another. [Citation.] The act must be one which has knowable and apparent potentialities for resulting in death. Mere inattention or mistake in judgment resulting even in death of another is not criminal unless the quality of the act makes it so. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the accused tended to endanger life." (*Id.* at p. 440, cited in annots. to CALCRIM Nos. 582 and 590.)

In *People v. Riazati* (2011) 195 Cal.App.4th 514 (*Riazati*), this court applied the criminal/gross negligence standard articulated in *Rodriguez* and the CALCRIM instructions in holding that section 597, subdivision (b) imposes "criminal liability for

---

negligence) and CALCRIM Nos. 590 and 970 (gross negligence). The two terms have been used interchangeably by reviewing courts. (See, e.g., *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1141, quoting *People v. Watson* (1981) 30 Cal.3d 290, 296-297 [" 'Implied malice contemplates a subjective awareness of a higher degree of risk than does gross [i.e., criminal] negligence . . . ' "].)

16

grossly negligent conduct that exposes a cared-for animal to a *high* risk of *great* bodily

injury . . . ." (*Riazati, supra,* at p. 531, italics added.)[9] The *Riazati* court emphasized that

"the risk of great bodily injury to the cared-for animal created by the defendant's alleged

gross negligence, in order to support a conviction for animal cruelty or animal neglect

under section 597(b), must be a *high* risk." (*Riazati, supra,* at pp. 531-532, italics added.)

In the present case, the evidence does not support findings that any of the five

dogs in question were at a *high* risk of death or *great* bodily injury at the time they were

impounded, or that Adams's conduct with respect to the dogs rose to the level of criminal

negligence—i.e., that she acted recklessly in a way that put any of the dogs at a high risk

of death or great bodily injury.[10] Monreal testified that none of the 27 dogs on the

property was underweight or appeared to be dehydrated, and that she did not see any

injuries from abuse. She stated that the majority of the dogs were "in good weight and

condition" and "looked really healthy." Lido's condition was the worst of the five subject

<hr>

9      The *Riazati* court approved the trial court's use of a modified version of
CALCRIM No. 970 to instruct the jury on gross (i.e., criminal) negligence. (*Riazati, supra,* 195 Cal.App.4th at pp. 527, 528, 532.)

10      The instruction that the trial court gave the jury regarding the charges of animal
cruelty under section 597, subdivision (b) informed the jury that the prosecution had to
prove that Adams was criminally negligent, and included a definition of criminal
negligence. However, the instruction's definition of criminal negligence did not include
the statements in the CALCRIM instructions on criminal negligence that "[a] person acts
with criminal [or gross] negligence when: [¶] 1. He or she acts in a reckless way that
creates a high risk of death or great bodily injury. [¶] AND [¶] 2. A reasonable person
would have known that acting in that way would create such a risk." (CALCRIM No.
582.)

17

dogs, but he died of pneumonia, not from his skin condition or eye infection, more than three months after he was impounded. Dr. Ransom testified that although Lido's pneumonia could have been caused by his medical condition, a lot of pathogens and diseases are present in a shelter environment. Thus, it is speculative to attribute Lido's death to the ailments that he was suffering at the time he was impounded.

Dr. Ransom testified that the infections and skin problems that the dogs suffered were not life threatening except in "very severe instances," and that "typically these dogs . . . get to a certain point where they look absolutely horrible and you could argue that they're suffering, but . . . their lives aren't necessarily at risk from this." He added that it is difficult to know whether a dog is suffering and that "[i]t's more of an empathetic kind of call on the part of the vet." Dr. Ransom's testimony suggests that certain of the dogs' ailments *possibly* could have become life threatening if left untreated; his testimony does not support a finding beyond a reasonable doubt that any of the dogs were at a high risk of death or great bodily injury at the time they were impounded.

Even assuming that the jury could reasonably have viewed the dogs' ailments as constituting great bodily injury or as placing the dogs at a high risk of great bodily injury, we conclude that there is insufficient evidence to support a finding that the ailments were the result of criminal negligence on the part of Adams—i.e., that she engaged in reckless conduct that created a risk of great bodily injury. Monreal testified that the "demodex" skin condition that the dogs suffered is caused by a parasite that all dogs carry and that under some conditions, causes dogs to lose hair. Dr. Ransom similarly testified that

18

demodecosis is caused by a type of mite that lives on the skin of most dogs, and can cause extensive hair loss and skin infections in severe cases. Demodecosis can be caused by a genetic abnormality that causes the condition to be manageable but not curable. Dr. Ransom testified that feces and dirt in the subject dogs' environment *possibly* exacerbated the dogs' demodecosis, but that was "not something that [he had] determined." Monreal and Dr. Ransom both testified that they had no idea what condition the confiscated dogs were in when Adams first took them into her custody, and Dr. Ransom's staff found no live mites on the dogs when they were examined after they were confiscated. Adams and her daughters testified that they had treated the dogs' skin conditions with medications, including ivermectin. Thus, whether the physical condition of the dogs had improved, worsened, or remained the same during the period they were in Adams's custody was purely a matter of speculation. An inference based on speculation, surmise, or conjecture is not reasonable. (*People v. Raley, supra,* 2 Cal.4th at p. 891.) There was no substantial evidence that the dogs' medical problems were caused or exacerbated by reckless conduct on Adams's part.

The prosecution argued to the jury that Adams subjected Oatie and Bayer to needless suffering by putting them in the crate in the shed. Monreal testified that she did not know how long the "dogs in the kennels" (presumably referring to Oatie and Bayer's being in a crate) had been in the kennels, or what type of care Adams had provided for them. Monreal testified that the fact that the dogs were in crates was not a factor in her decision to impound them and that there is nothing wrong with crating a dog. Adams

19

testified that she never crated any animal or left any animal in the bathroom for more than four hours, and that the dogs that she put into crates when she had to leave her property typically spent about 30 minutes a day in a crate. Kali testified that the dogs were put in "the kennels" whenever no one was home, which rarely occurred, and that the dogs otherwise were not kept in the kennels. Dr. Ransom testified that the proper size for a dog crate was a "judgment call," and that a crate just large enough for a dog to stand up and turn around was acceptable "for specific types of crating activities," including when an owner goes to work in the morning and returns eight hours later. When asked if the crates he saw on Adams's property were large enough for the dogs to stand up and turn around, Dr. Ransom answered, "Absolutely, yes." Thus, the evidence regarding Adams's crating Oatie and Bayer does not reasonably support a finding that Adams engaged in reckless conduct that subjected the dogs to a high risk of death or great bodily injury.

The theory of the prosecution's case was largely that Adams's failed to provide proper veterinary care to the five dogs in question. Dr. Ransom testified that the "illnesses" that all five dogs suffered could have been prevented with routine care and proper husbandry, and by putting them on appropriate medications when they showed signs of illness, before their conditions "got to the point that they were at when we found them." The prosecutor argued to the jury that "[j]ust looking at those dogs an ordinary, careful, reasonable person would consider and would, in fact, take those dogs to get medical care. Not Ms. Adams. She knew better." The prosecutor further argued that "[b]asic care" included "[t]aking a dog to a vet," and that Adams "had been to the vet that

20

week and she made a decision every day to every [one] of those [five] dogs that she did not take any one of those dogs to the vet."

As Adams points out in her opening brief, the only omissions (in contrast to acts) that are specifically made punishable under section 597, subdivision (b) are the failure "to provide the animal with proper food, drink, or shelter or protection from the weather . . . ." Section 597, subdivision (b) does not penalize an owner or custodian of an animal for failing to provide the animal medical care. Accordingly, Adams's failure to seek veterinary treatment for the subject dogs is not a proper basis for an animal cruelty conviction under section 597, subdivision (b). Adams's convictions for animal cruelty are not supported by substantial evidence.

In light of our reversal of those convictions for insufficiency of the evidence, we need not consider Adams's contention that the court prejudicially erred by giving the jury an incomplete instruction on criminal negligence.

IV.

DISPOSITION

The judgment is reversed as to the convictions on counts one through five for animal cruelty.  The judgment is otherwise affirmed.

_____

AARON, J.

WE CONCUR:

_____

McCONNELL, P. J.

_____

McDONALD, J.