Filed 9/25/23  P. v. Williams CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Colusa)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN WILLIAMS III,<br><br>Defendant and Appellant. | C095180<br><br>(Super. Ct. No. CR618862) |

Defendant John Williams III and another man, Michael Gene Jones, Jr., robbed a bank in Arbuckle.  A jury found defendant guilty of two counts of second degree robbery.  The first count was based on defendant robbing one teller at gunpoint; the second count was based on his aiding and abetting Jones in robbing a second teller.  With respect to both counts, the jury also found defendant personally used a firearm.  The trial court sentenced defendant to an aggregate determinate prison term of 16 years.

On appeal, defendant contends:  (1) the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury with a modified version of

1

CALCRIM No. 402 on the natural and probable consequences doctrine; (2) Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567), which took effect during the pendency of this appeal, applies retroactively to this case and requires remand for a new sentencing hearing because the trial court imposed an upper term sentence for robbery based on defendant's criminal record but did not rely on certified records of conviction in making this finding; and (3) the sentencing minutes and abstract of judgment must be corrected to conform to the oral pronouncement of judgment.

We shall vacate defendant's sentence, remand the matter for resentencing, and otherwise affirm the judgment. As we explain, the asserted instructional error was invited by defendant and therefore may not be raised on appeal. Further, defendant has failed to carry his appellate burden of establishing he was prejudiced by the asserted error. Defendant's claim of sentencing error, however, has merit and requires remand for resentencing in accordance with Penal Code[1] section 1170, as amended by Senate Bill 567. While we agree the current sentencing minutes and abstract of judgment do not conform to the oral pronouncement of judgment, since we are remanding the matter for resentencing, any such error necessarily will be corrected.

## FACTS

### *The Bank Robbery*

In July 2019, the Umpqua Bank in Arbuckle had its bank tellers located at desks in the bank's lobby. On the fifth of that month, J.A. and K.A. were working as tellers at the bank. They each had a cash drawer located beneath their desks. Shortly before the bank closed for the day, defendant and Jones entered the lobby carrying handguns.

Defendant was the first through the door. He was carrying a black semiautomatic handgun and was wearing black pants, a black hooded sweatshirt, a face covering,

---

[1]    Undesignated statutory references are to the Penal Code.

2

gloves, and a backpack. Defendant waved the gun in the air and yelled: "This is a bank robbery. Hands where I can see them." He also instructed the tellers to open their cash drawers. Jones followed defendant into the bank, also carrying a handgun. He was wearing dark pants, a gray hooded sweatshirt, gloves, and had a Raiders mask covering his face.

J.A. and K.A. complied with the demand to open their cash drawers. Defendant went to J.A.'s desk and took the money from the drawer. Jones went to K.A.'s desk and did the same. They then left the bank and drove away in a tan or brown pickup truck. In all, defendant and Jones took more than $4,500 in cash.

Although no one inside the bank was able to identify either defendant or Jones, physical descriptions provided by J.A. and K.A. generally matched their respective physical attributes. Their DNA was also on items of clothing they abandoned during the flight from the bank.

### *Flight from the Bank*

A witness who was at the bank's automated teller machine when the robbery began flagged down the Arbuckle Fire Chief, Casey Cox, who happened to be driving by in his work vehicle. The witness told Cox about the robbery and pointed to the truck he believed was associated with the robbers. Cox could see the truck the witness was referring to in his rearview mirror, made a U-turn, and began following the truck as it drove away from the bank.

Cox radioed dispatch to inform law enforcement that he was following the truck and periodically updated them of the truck's location as he followed from a distance. Cox followed the truck south on 5th Street and continued to do so as it merged onto Interstate 5 and headed south on the freeway. The truck left the freeway at Yolo County Line Road. Cox briefly lost sight of it as it exited. When he regained visual contact with the truck, it was stopped near the stop sign at Yolo County Line Road, on the gravel shoulder, both doors were open, and a person was getting into the passenger seat,

3

suggesting the driver and passenger had swapped seats. When the truck drove off again, it was being driven more aggressively than before. Cox continued following the truck until they reached the Tehama-Colusa Canal a short distance away, at which point he was passed by Deputy Robert Ladd of the Colusa County Sheriff's Office.

Deputy Ladd took over the pursuit and followed the truck at a high rate of speed with lights and sirens on. Ladd followed the truck as it turned left onto County Road 85A and then left onto County Road 2, but lost sight of it at a bend in the road just before it got to County Road 86. Ladd slowed down to assess whether the truck had turned onto that road, and seeing no sign of the truck in either direction, continued on County Road 2, again accelerating to a high rate of speed. When Ladd regained visual contact with the truck, it was making a right turn onto a private dirt road surrounded by an orchard. The property was known as Dhillon Ranches. The truck stopped briefly while the passenger got out and ran into the orchard. The truck then continued down the dirt road. Ladd decided to continue following the truck rather than chase the passenger on foot. The fleeing truck, however, created a thick cloud of dust that reduced visibility to zero. As a result, Ladd abandoned the vehicle pursuit and returned to where he had last seen the other man running into the orchard.

Deputy Ladd drove back to County Road 2, turned right, made another right at County Road 88, and then saw the suspect running through the orchard. He stopped his patrol car and gave chase on foot. Except for believing that the fleeing suspect was in his 20's, Ladd's description of him was generally consistent with defendant. However, as Ladd also explained, his age estimate was based on the suspect's "physical condition" and the fact that "he had been running for . . . quite some distance" and "didn't show any signs of slowing down." Ladd eventually abandoned this pursuit as well.

Meanwhile, Sergeant Arnold Navarro was also dispatched to the Dhillon Ranches property. While driving through the property, he noticed a damaged fence and found the

4

truck in the orchard a short distance past the fence, with wire and part of a fence post attached to the right front tire. The truck was still running, but no one was inside.

After Deputy Ladd abandoned his pursuit of defendant and returned to his patrol car, he flew a drone over the area for about four hours, but did not locate either suspect. Eventually, the California Highway Patrol assisted in the aerial search with a helicopter. A perimeter was also set up at various county roads. These efforts were also unsuccessful in locating the men.

### *Subsequent Investigation and Additional Identification Evidence*

At some point, the search for the suspects transitioned to evidence collection. Additional officers arrived at the abandoned truck and searched the surrounding area. The hooded sweatshirt, Raiders mask, and latex gloves that Jones was wearing during the robbery were found on the ground near the truck. Jones's DNA profile was a match for that found on the mask and on one of the gloves.

Later that night, Deputy Ladd retraced the route he took during the vehicle pursuit. On the south side of County Road 2, just east of County Road 86, Ladd found the hooded sweatshirt defendant was wearing during the robbery, as well as a light blue beanie, purple head covering, and a pair of jeans. This was where Ladd had briefly lost sight of the truck during the pursuit. Defendant's DNA profile was a match for that found on the head covering and beanie.

We note that defendant and Jones are cousins. They spent the day before the robbery together. Jones's sister lived near the area where the truck was abandoned. Defendant and Jones were also transported to court together in August 2020. In a recorded conversation between the two, defendant asked Jones whether the police got the clothes he threw out the window, and whether that was where they got the DNA.

5

## DISCUSSION

## I

### *CALCRIM No. 402*

Defendant contends the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury with a modified version of CALCRIM No. 402 on the natural and probable consequences doctrine. For reasons that we will explain, we conclude this asserted error was invited by defendant and may not be raised on appeal.

**A.** *Additional Background*

Defendant represented himself at trial with the assistance of advisory counsel. After the trial court conferred with the prosecutor and defendant off the record regarding the jury instructions, the trial court described their discussion for the record. With respect to CALCRIM No. 402 on the natural and probable consequences doctrine, the trial court noted that defendant requested this instruction. The trial court then stated: "I initially didn't see that as necessary, but then the [prosecutor] spoke up on behalf of that as well, and I could see the point that he was making about that, so I've endeavored to make an instruction that covers that ground." The trial court further explained that it modified the instruction based on their "off-the-record discussions, to make Count I the target offense" and "[count II] would be the non-target offense." The trial court asked defendant whether he had anything to add. Defendant responded: "No."

The written version of the instruction[2] given to the jury began by informing the jury that defendant was charged with committing second degree robbery in count I and

---

[2] The trial court misread a portion of the written instruction during the oral reading. The discrepancy is not material to our assessment of this issue. However, where discrepancies exist between the written and oral versions of the instructions, we presume the jury followed the written version. (*People v. Grimes* (2016) 1 Cal.5th 698, 729.)

6

aiding and abetting the commission of second degree robbery in count II. The jury was instructed to first decide whether defendant was guilty of second degree robbery as charged in count I, and if so, to then decide whether he was guilty of aiding and abetting second degree robbery as charged in count II.

The jury was then informed: "Under some circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of Aiding and Abetting Robbery in the Second Degree as charged in Count II, the People must prove that: [¶] 1. The defendant is guilty of Robbery in the Second Degree as charged in Count I; [¶] 2. During the commission of Robbery in the Second Degree as charged in Count I, a coparticipant in that Robbery in the Second Degree as charged in Count I committed the crime of Aiding and Abetting Robbery in the Second Degree as charged in Count II; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of Aiding and Abetting Robbery in the Second Degree as charged in Count II was a natural and probable consequence of the commission of the Robbery in the Second Degree charged in Count I."

After properly defining the phrases "coparticipant" and "natural and probable consequence," the instruction concluded: "To decide whether [the] crime of Aiding and Abetting Robbery in the Second Degree as charged in Count II was committed, please refer to the separate instructions that I will give you on that crime."

During closing argument, the prosecutor did not mention the natural and probable consequences doctrine or CALCRIM No. 402. Instead, the prosecutor argued defendant was guilty of the robbery charged in count I as the direct perpetrator (i.e., the man who took cash from J.A.'s cash drawer at gunpoint) and guilty of the robbery charged in count II as an aider and abettor (i.e., while Jones was the direct perpetrator who took cash from K.A.'s cash drawer, defendant knew Jones intended to commit this crime, intended to aid and abet him in doing so, and did in fact aid and abet the robbery of K.A.). In support of

7

this theory, the prosecutor specifically referred to CALCRIM No. 401, which accurately sets forth the elements of aiding and abetting liability.

## B. *Analysis*

"The doctrine of invited error bars a defendant from challenging [on appeal] an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723; accord, *People v. Harris* (2008) 43 Cal.4th 1269, 1293; see also *People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3 ["doctrine of invited error applies to estop a party from asserting an error when 'his own conduct *induces the commission of error*' "]; *People v. Riazati* (2011) 195 Cal.App.4th 514, 529.)

Defendant, who in this appeal is represented by counsel, argues CALCRIM No. 402 does not apply to the facts of this case because "the nontarget offense [robbery of K.A.] committed by the actual perpetrator [Jones] must be a natural and probable consequence *of the target crime* [robbery of J.A.] *the defendant aided and abetted*," but defendant did not aid and abet the robbery of J.A. because "he was the direct perpetrator" of that crime.

In any event, assuming without deciding that the instruction should not have been given, the asserted error was harmless.[3] The evidence overwhelmingly established that two gunmen entered the Umpqua Bank in Arbuckle, robbed two tellers of a substantial

---

[3]    The People argue the natural and probable consequences doctrine could apply to the facts of this case, but concede the instruction, as modified by the trial court, "was ambiguous." We need not decide whether the instruction should not have been given at all, or should have been given differently, because it was harmless either way. Moreover, to the extent defendant argues on appeal that the trial court's modifications were erroneous, he did not object to these modifications and has therefore forfeited any such assertion unless his substantial rights were violated. (See *People v. Nilsson* (2015) 242 Cal.App.4th 1, 23.) Having concluded any asserted error to be harmless, defendant's substantial rights were not affected.

8

amount of cash from the cash drawers, fled in a pickup truck, and then successfully avoided apprehension that night after abandoning the truck and various items of clothing worn during the robbery. At trial, defendant disputed that he was one of the robbers. However, while there was no direct evidence identifying defendant, the circumstantial evidence described earlier in this opinion was very strong. It will suffice to highlight that defendant's DNA profile was a match for that found on the head covering and beanie the first robber was wearing when he robbed J.A.; these items were recovered along the pursuit route; and defendant admitted to Jones that he threw these items out of the window. Additionally, Jones's DNA profile was a match for that found on the Raiders mask and one of the gloves the second robber was wearing when he robbed K.A. Defendant and Jones are cousins, who spent the day before the robbery together. And Jones's sister lived near the area where the truck was abandoned, giving them a place to have gone to evade apprehension after abandoning the truck.

This was not a close case. Defendant entered the bank and robbed J.A. while Jones followed him into the bank and robbed K.A. Defendant was guilty of both robberies, the first as the direct perpetrator and the second as an aider and abettor, as argued by the prosecutor. And in support of this theory, the prosecutor specifically referred to CALCRIM No. 401, which accurately set forth the elements of aiding and abetting liability. The prosecutor never argued defendant was guilty of the robbery of K.A. under a natural and probable consequences theory, and never referred the jury to CALCRIM No. 402. The jury was also properly instructed that some instructions might not apply depending on their assessment of the facts.

Based on the strength of the evidence establishing defendant's guilt of these crimes without resorting to the natural and probable consequences theory, the fact that the prosecutor did not argue that theory, and the fact that the jury was instructed that some instructions might not apply, we are convinced that the jury would have concluded that

9

CALCRIM No. 402 simply did not apply. (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 627-628.)

This conclusion is also bolstered by the wording of the challenged instruction. As stated previously, it told the jury to decide whether defendant was guilty of the robbery of J.A. as charged in count I, and if so, to then decide whether he was guilty of aiding and abetting the robbery of K.A. as charged in count II. The instruction also told the jury that in deciding whether the crime of aiding and abetting the robbery of K.A. as charged in count II was committed, "please refer to the separate instructions that I will give you on that crime." Those instructions were the robbery instructions and the aiding and abetting instructions, none of which are challenged in this appeal.

Moreover, even the challenged portion would have indicated to the jury that it did not apply. With respect to the natural and probable consequences theory, the instruction stated that to be guilty of *aiding and abetting* the robbery of K.A. under this theory, the People were required to prove: (1) defendant robbed J.A. as charged in count I; (2) during the commission of that robbery, *a coparticipant aided and abetted* the robbery of K.A. as charged in count II; and (3) a reasonable person in defendant's position would have known that aiding and abetting the robbery of K.A. was a natural and probable consequence of defendant's commission of the robbery of J.A. The jury would have found the first to be true based on defendant's direct perpetration of the crime. With respect to the second, it was defendant and not "a coparticipant" who was charged with aiding and abetting the robbery of K.A. Thus, at this point, the jury would have either concluded that this instruction did not apply or that it needed to determine whether defendant aided and abetted the robbery of K.A. If the latter, the jury would have properly used the robbery and aiding and abetting instructions to do so, and that is all that is required to support defendant's conviction in count II.

For all these reasons, we conclude any error that may have resulted from giving the modified version of CALCRIM No. 402, at defendant's request, was harmless. The

10

result is the same whether we use the state law standard for assessing prejudice or the federal constitutional standard of harmless beyond a reasonable doubt.

## II

### *Senate Bill 567*

Defendant also claims Senate Bill 567 applies retroactively to this case and requires remand for a new sentencing hearing because the trial court imposed an upper term sentence for robbery based on defendant's criminal record but did not rely on certified records of conviction in making this finding. We agree.

In October 2021, the trial court sentenced defendant to an upper term sentence of five years for the robbery of J.A., plus 10 years for the firearm enhancement, plus one year (one-third the middle term) for the robbery of K.A. The trial court selected the upper term because "defendant has a significant and increasingly serious criminal record, including seven prior felony convictions, one of which was for robbery."

Effective January 1, 2022, Senate Bill 567 amended section 1170 to limit the trial court's ability to impose an upper term determinate sentence by making the middle term the presumptive prison term unless specified circumstances exist. (§ 1170, subd. (b)(1)-(2); Stats. 2021, ch. 731, § 1.3.) A trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.3.) The amended statute also permits the trial court to "consider the defendant's prior convictions in determining sentencing *based on a certified record of conviction* without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3), italics added.)

As the People properly concede, this ameliorative change in the sentencing law applies retroactively to cases not yet final on appeal. (*People v. Zabelle* (2022)

11

80 Cal.App.5th 1098, 1109; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) The People also acknowledge that, in selecting the upper term based on defendant's prior convictions, the trial court "appears [to have] relied upon the probation officer's recitation of [defendant's prior convictions] in the presentence report as there are no other certified records of conviction in the record." This was error. (See *People v. Dunn* (2022) 81 Cal.App.5th 394, 403-404 [probation report is not a certified record of conviction within the meaning of § 1170, subd. (b)(3)].)

The People argue, however, that the error did not violate defendant's constitutional rights and was harmless under the state law standard for assessing prejudice "because there is no reasonable probability that the jury would not have found that [defendant] had suffered the seven prior felony convictions, including the prior conviction for robbery." We agree there was no constitutional violation. The trial court, as it did in this case, may impose an upper term sentence based on a defendant's prior convictions, including the number and increasing seriousness of these convictions, without running afoul of the Sixth Amendment. (*People v. Black* (2007) 41 Cal.4th 799, 819-820; *People v. Scott* (2015) 61 Cal.4th 363, 405.) While the trial court erred by doing so based on the probation report rather than relying on certified records of conviction, this is solely a violation of state statutory law. We therefore apply the harmless-error test articulated in *People v. Watson* (1956) 46 Cal.2d 818.

We disagree, however, with the People's argument that the error was harmless. Under *Watson*, we must determine whether "it is reasonably probable that a result more favorable to [defendant] would have been reached" (*People v. Watson, supra*, 46 Cal.2d at p. 836) had the trial court relied on certified records of conviction rather than the probation report. Given the proof that is now legally required, we cannot conclude this error was harmless. "Our analysis rests on the meaning of 'reasonably probable.' It does not mean more likely than not," but instead means " ' "merely a *reasonable chance*, more than an *abstract possibility*[,]" . . . " '[a] probability sufficient to undermine confidence in

12

the outcome.' " ' " (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324.) We do not know whether the probation report accurately reflects defendant's criminal record, and if not, the significance of any discrepancies that may exist between the certified records of conviction and the recitation provided in the probation report. While we cannot say it is *likely* there is an error in the probation report, or that any such error would *likely* have resulted in a lesser sentence, errors do occur, and the prospect of one resulting in a lesser sentence is more than an abstract possibility.

We therefore vacate defendant's sentence and remand the matter for resentencing.

### III

### *Correction of the Sentencing Minutes and Abstract of Judgment*

Finally, as defendant accurately observes, and as the People properly concede, there is an error in the current abstract of judgment and minutes of the sentencing hearing. Both must accurately reflect all components of the sentence imposed by the trial court. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385-390.) The trial court orally imposed a sentence of "one year additional, subordinate and consecutive, according to law." This was a consecutive one-year term (one-third the middle term) for second degree robbery. (See § 213, subd. (a)(2).) The minute order from the sentencing hearing, however, indicates that the trial court imposed a lower term of one year for count II. The abstract of judgment also reflects a "consecutive full term" of one year for count II. We need not order any correction, however, because we are vacating defendant's current sentence and remanding the matter for resentencing, which will result in the erroneous sentencing minutes and abstract of judgment being superseded by new sentencing minutes and a new abstract of judgment. We direct the trial court to ensure that the new minutes and abstract of judgment accurately reflect defendant's new sentence and do not contain the errors noted above.

## DISPOSITION

Defendant's sentence is vacated, and the matter is remanded for resentencing. In all other respects, the judgment is affirmed. Following resentencing, the trial court shall prepare new sentencing minutes and a new abstract of judgment accurately reflecting the sentence imposed and forward a certified copy of the new abstract of judgment to the Department of Corrections and Rehabilitation.

/s/
WISEMAN, J.*

We concur:

/s/
MAURO, Acting P. J.

/s/
MESIWALA, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14