Filed 12/19/24  P. v. Hernandez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081685 |
| v. | (Super.Ct.No. INF1902001) |
| JOSE FRANCISCO HERNANDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jason L. Stone, Judge.

Affirmed in part, vacated in part, and remanded with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and

Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland , Assistant Attorney General, Collette C. Cavalier, Kathryn

Kirschbaum and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and

Respondent.

1

A jury convicted Jose Francisco Hernandez of committing numerous sexual offenses against his minor stepdaughter. On appeal, he argues that the trial court prejudicially erred by admitting expert testimony about child sexual abuse accommodation syndrome (CSAAS) and by instructing the jury about the syndrome. We reject the arguments but nevertheless remand for resentencing because, as the People correctly concede, the trial court erred by applying the wrong sentencing triad for several of the offenses.

## BACKGROUND

Doe was born in November 1998. When she was four years old, Hernandez started to live with her family, which consisted of her mother and a two-year-old brother. The family lived in four different residences when Doe was four to 18 years old, listed chronologically as: E Street, Avenida Valdez, Sky Blue Water, and El Canto Road.

In 2019, when Doe was 21 years old, she reported to law enforcement that Hernandez had sexually abused her when she was a child. A detective interviewed Doe and later arrested Hernandez.

Hernandez was charged by information with two counts of aggravated sexual assault (oral copulation) of Doe when she was under 14 years old (Pen. Code, § 269, subd. (a)(4); counts 1 & 2) and four counts of engaging in lewd and lascivious conduct with Doe "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" when she was under 14 years old (Pen. Code, § 288, subd. (b)(1); counts 3-6). (Unlabeled statutory references are to the Penal Code.) The conduct underlying all of

2

the offenses was alleged to have occurred between November 2005 and November 2010. The information alleged specific acts as forming the basis of each offense, consisting of the "first time" and the "second time" for counts 1 and 2 and "Grinding in shower," "Horse game," "Grinding during dance incident," and "Soccer practice—Skywater house" for counts 3 through 6.

Doe testified at trial, when she was 24 years old. She said that Hernandez started "touching [her] inappropriately" when she was seven years old and that it happened about two to three times per week until she was 12 years old.

The first time occurred when Doe and Hernandez were alone in Hernandez's bedroom and Doe's mother was not home. Hernandez told Doe that they were "going to play a game" in which Doe "was the mommy and he was the daddy." He directed Doe to undress, which she did, and pulled down his pants so that he was naked below the waist. While lying on the bed with his penis exposed and erect, Hernandez instructed Doe, who was also naked, "to get on top of him and ride him" like a horse. Doe testified that she got on top of Hernandez and per Hernandez's instruction started "grinding" on his penis with her vagina until he ejaculated.

Doe did not tell anybody about what happened, because Hernandez told her that the game was their "little secret" and that she should not say anything. Doe feared Hernandez. Doe said that throughout her childhood Hernandez hit her with his hand, a belt, a slipper, or "anything that was around him." Doe said that Hernandez also hit her mother and her brother.

After the first incident, Doe testified that Hernandez touched her "regularly" and "constantly"—basically "[a]ny chance that [they] were alone." Hernandez started taking a shower with Doe when she was seven years old and thereafter touched her in the shower approximately two to three times per week. Doe said that the showering started as "something normal," with Hernandez washing her with soap and water and telling her that she needed to be cleaner. Doe's mother did not help her bathe. Doe also stated that while they were inside the shower Hernandez "would touch [her], and then he would tell [her] to pull his erect[] penis."

When Doe was 10 years old, the family moved to a house on El Canto, where they lived until she turned 18. The shower in the primary bathroom at the El Canto house contained a built-in bench, and a curtain separated the bathroom from the bedroom. While inside the El Canto shower with Doe, Hernandez sat on the bench and instructed Doe "to get on top of him and just ride him." Doe sat on top of Hernandez, facing toward him, and she "grind[ed] on him" until he ejaculated. Doe testified that "these incidents in the shower" were "[a] regular occurrence."

Doe also testified that Hernandez grabbed her buttocks on more than one occasion when they danced together. Doe told the detective that once when she was seven or eight years old Hernandez told her to take off her clothes so that they could have fun and dance, and "afterwards he just told [her] to sit on him and grind," while she was still "completely naked."

4

Doe testified that Hernandez also touched her while he was lying in his bed. Doe testified that sometimes no one else was in bed with them when Hernandez touched her, and sometimes Doe's mother was in the bed asleep when it happened. That testimony conflicted with Doe's prior statement to the detective that no one was ever present when Hernandez touched her. At trial, Doe testified that Hernandez touched her "[w]ith his fingers" and "would put his fingers inside" her, which caused her pain. Doe could not recall exactly how often Hernandez digitally penetrated her, but she said that it happened "[w]ay more" than 10 times. But when the detective interviewed Doe before trial, Doe reported that she could not remember whether Hernandez ever digitally penetrated her. She told the detective that Hernandez "touch[ed her] a lot with his fingers," and she said that it was possible that he digitally penetrated her but that she did not remember.

Doe described other incidents that occurred while her brother was at soccer practice. Hernandez, Doe's mother, and Doe would go together to her brother's soccer practice, but during practice Hernandez would create a pretext to take Doe back to the house on Sky Blue Water and later on El Canto. In his bedroom at home, Hernandez "would pull down [her] bottoms and start performing oral sex on [her] or grinding on [her]," rubbing his erect penis against her vagina until he ejaculated.

After the family moved to the El Canto residence, Hernandez still had access to the empty house located on Sky Blue Water. Hernandez took Doe there approximately four times. In the empty house, Hernandez "laid [Doe] on the ground and he had an erect[] penis, and he rubbed on [her] until he came on [her] stomach."

5

When Doe was about 11 years old, Doe told her mother that Hernandez "was trying to touch [her]," and her mother responded, "[i]f he was, it was maybe because [Doe] was being provocative or throwing [herself] at him." Hernandez repeatedly also told Doe that it was her fault because she "would throw [herself] at him." Doe never broached the subject with her mother again.

Doe testified that the sexual abuse stopped when she was around 12 years old. She threatened Hernandez that she would report the abuse to the police. Every time Hernandez attempted to touch her, she would either threaten to call law enforcement or would scream because there were other people in the house. In addition, she avoided going into rooms where he was present and avoided taking showers when he was home. Doe testified that toward the end of the abuse, when she was about 12 years old, she physically pushed Hernandez away from her more than once. Hernandez responded by grabbing her "harder," hitting her, or telling her that she "was being a bad daughter."

Doe recalled one occasion on which she tried to push Hernandez away while he was performing oral sex on her in the bathroom. Hernandez had placed Doe on the bathroom counter sink. Doe pushed him, and Hernandez responded by holding onto her tightly by the waist. She kicked Hernandez until he stopped.

Doe got her own bedroom when she was 14 or 15 years old and blocked the door with furniture. Hernandez continued "slapping [Doe's] ass and grabbing [her] breast" until she moved out when she was 18 years old. Doe said that after Hernandez stopped sexually abusing her he would tell Doe that if she wanted to have a boyfriend or any

6

independence, then she would have to allow him to be the first person to have sexual intercourse with her.

Doe got married when she was 18 years old. Several years later, she told her husband about the sexual abuse, and her husband recommended that she report the abuse to the police. A detective interviewed Doe about the reported abuse and asked her to make a pretext telephone call to Hernandez, which the detective described to Doe as a recorded telephone conversation in which Doe "would try to get [Hernandez] to talk about the incidents."

Doe called Hernandez with the detective present in the room. Doe and Hernandez spoke in Spanish, and the detective was a Spanish speaker. The call was recorded, and a recording was played for the jury. The jury was provided a transcript of the call that was translated into English.

Doe told Hernandez that she had been seeing a psychologist, who advised her that she needed to forgive those who hurt her. Doe repeatedly told Hernandez that she forgave him and was not angry, but in order to progress in her treatment she "need[ed] to know why [he] did what [he] did when [she] was younger." Hernandez responded, "Yes. It st— it started as a game [Doe]. Let's be honest and let's be realistic. It started as a game and that was arising. Things started – started arising. They didn't just happen." He described the "game" as Doe throwing herself "on top of [him]" when she was "little," "hugging and kissing" him, and saying that he was her husband. He explained: "[W]e started all of that as a game then that kept arising and it's not like now it's causing,

7

well, it's – it's – it's something that kept arising, something that's being born that is – is happening that is – that is growing, you see?" After describing the "game" again, Hernandez said: "Many things arise from there."

Hernandez acknowledged that he "did wrong" and that he gave Doe "a few kisses." He also repeatedly told Doe that "it wasn't just [his] fault."

The detective who was in the room with Doe during the call described Doe's demeanor after the call as "very, very distraught." Law enforcement arrested Hernandez after the pretext call. A detective interviewed Hernandez in Spanish at the police station. The interview was recorded. The video recording was played for the jury, and the jury was provided a transcript translated into English.

Hernandez told the detective that when Doe was young she was "really clingy" and always wanted to be around him. She always hugged and kissed him after he returned home from work. He said that she once bit his lip.

Hernandez told the detective that Doe called him earlier and told him that she wanted to forgive him for "'something that [he] did to [her]'" and that he responded, "'No, well, what did you do when we used to play? . . . Yes, but remember the fault is not mine, because you'd play with me.'" Hernandez said that when Doe was seven or eight years old she would get on top of him when he was lying in bed, hug him, and kiss him on the mouth. Doe called herself Hernandez's wife. Hernandez said that sometimes when Doe was a "bit older" she would lie next to him and ask him to scratch her back.

8

He also said that he would "give her a little spank." He said that the "little spanking" happened "often."

The detective asked Hernandez what else had happened between him and Doe, and Hernandez answered, "It was just the – it was touching, that's the only thing." He also described how when Doe was six or seven years old she would get into the shower with him. He said that twice when Doe was around nine or 10 years old she walked into the shower naked when he was showering and told him to sit down on the bench, which he did. She then "got on top of" him, "was . . . getting in the middle," and hugged him tightly for approximately one and one-half minutes, but Hernandez said all of that happened "without penetration, without anything." Hernandez said that they were both naked when they showered and that Doe "almost always showered along" with him. Hernandez admitted that Doe showered with him when she was between the ages of seven and 12 years old.

Hernandez described another incident in which Doe climbed on top of him when he was lying on the bed. He said that both of them were clothed on that occasion, but he also said there were three or four times when she did the same thing but was naked, which he liked, and another time when she was wearing only underwear. Hernandez said that Doe would "throw herself on [him] and she'd hug [him]," and "she grabbed [him]" and "rub[bed] herself on [him]." Hernandez said that once when Doe's brother was at soccer practice, Hernandez went home with Doe and "started playing." Doe "threw [him] on the bed," and "[t]hen she threw herself on [him]."

9

The detective asked Hernandez if he ever "kissed her down there," and Hernandez said that he had "like, twice." But he also said that he only remembered it happening once. He described another incident, when Doe was approximately 11 or 12 years old, in which she "grabbed and pulled" Hernandez's penis, and he got an erection and "rubbed it on her." He said that he then kissed her legs. The detective asked whether Hernandez meant "her entire legs and her vagina," and Hernandez responded, "Yes, like that." The incident occurred in the bathroom, with Doe sitting on the counter. The detective asked Hernandez if he "put [his] tongue in," and Hernandez denied that he had, saying, "No, just kisses only – just kisses." Hernandez denied that he ever penetrated Doe.

During the interview, Hernandez wrote an apology letter to Doe that reads: Doe, "'if I offended you somehow, forgive me. I know it was wrong, what happened, but remember that it wasn't just my fault. It was both of our faults. Because when you were little, you acted like an adult. But I want to tell you to forgive me. And if someday you want to speak with me, I will ask your forgiveness, kneeling if necessary.'"

At trial, Dr. Veronica Thomas, Ph.D., a clinical and forensic psychologist, testified for the prosecution. Dr. Thomas did not have any information about the case or the parties. She testified about CSAAS, which she described as a not scientifically proven theory that is a helpful tool for understanding a child's reaction to sexual abuse perpetrated by a person known to the child. CSAAS has five components: (1) secrecy, (2) helplessness, (3) entrapment/accommodation, (4) delayed or discrepant disclosure, and (5) recantation or retraction. Dr. Thomas explained that CSAAS is not a diagnostic

10

tool used to determine whether a child has been abused, even if all five factors are present.

With respect to delayed disclosure, Dr. Thomas testified that children frequently delay disclosing sexual abuse by known perpetrators. She explained that "most people don't tell anybody until many, many years later, usually under other circumstances such as a divorce or a death of a loved one, they're in therapy, or they need medication and they're at the psychiatrist. . . . And it's because the complexity of relationships and the depth and importance of the emotional fabric between all those parties is so powerful." Dr. Thomas also explained that a child is more likely to disclose abuse to a "a supportive female," like a "mother figure," but if that person does not support the child when they disclose the abuse, then the child "may not say more." She further testified that if the child is "shut down or otherwise it is inferred that what they're saying is invalid and preposterous, the likelihood of saying other things is going to be much less."

As to discrepant disclosure, Dr. Thomas testified that children who are sexually abused by someone they know often have difficulty remembering what happened and that memory is "a process." She explained that a victim's memory may not always be consistent because it is "so difficult for people to accept" that a family member perpetrated the abuse.

Both Doe's mother and her brother testified for the defense. Both of them denied that Hernandez physically abused them or Doe or that they ever witnessed Hernandez sexually abuse Doe. Both testified that Hernandez was never left alone with Doe. Doe's

11

mother said that she always bathed Doe when Doe was between the ages of seven and 12 years old. Doe's mother denied that Doe ever told her that Hernandez was sexually abusing her.

The jury convicted Hernandez on all counts. The trial court sentenced Hernandez to an aggregate term of 50 years to life in state prison, consisting of two consecutive terms of 15 years to life for the aggravated sexual assault counts (counts 1 & 2) and consecutive sentences of five years for each of the lewd and lascivious conduct counts (counts 3-6).

DISCUSSION

I. *CSAAS evidence and jury instruction*

Hernandez argues that the trial court prejudicially erred by admitting expert testimony about CSAAS and by instructing the jury with CALCRIM No. 1193. Both arguments lack merit.

A. *Relevant proceedings*

Before trial, Hernandez moved to exclude the expert testimony on CSAAS under Evidence Code section 801, arguing that the subject was not sufficiently beyond the common experience of a layperson. At the hearing on the motion, defense counsel also argued that the evidence was inadmissible under Evidence Code section 352. She argued that the evidence would unduly prejudice Hernandez by bolstering Doe's credibility. Defense counsel argued in the alternative that the court should give "a limiting instruction" in the event that it admitted the CSAAS evidence.

The court denied the motion to exclude the CSAAS evidence, reasoning that the evidence was relevant and admissible because of Doe's delayed disclosure. The court also indicated that CALCRIM No. 1193 "discusses the limitations" and tells the jurors that "they are not to draw any inference that the alleged victim is telling the truth here."

During trial, the court asked counsel to submit their requested instructions. The prosecutor stated that he had already filed a written request. The court told defense counsel to inform the court if there were "any specifics that [she] want[ed] outside of that." Defense counsel responded, "I know there was – I believe it was 1193. So we have the limited instruction and the late-disclosure instruction. I know those for certain."

During an initial instructions conference, defense counsel asked what limiting instruction the court would give and noted "that the Court put in 303 generally." The court replied, "Yes. And then there's CALCRIM 1193 –" to which defense counsel remarked, "I think I may have missed that." At a later hearing concerning jury instructions, the court inquired about CALCRIM No. 1193 as follows: CALCRIM No. "1193 is the testimony on CSAAS. Any – any objection?" The prosecutor remarked that he did not object and said, "I think we didn't request it. I think we should have." The court responded, "I don't believe you requested it. This was requested on behalf of the defense." The court also stated, "But I believe it's sua sponte, given CSAAS was testified to." The prosecutor repeated that he did not object to the jury being given CALCRIM No. 1193, and defense counsel stated, "That's fine, Your Honor. Thank you."

13

The jury was instructed with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Veronica Thomas regarding child sexual abuse accommodation syndrome. Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Dr. Thomas's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not (Jane Doe's) conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

During closing argument, defense counsel argued that Doe's mother and brother were credible and that Doe was not. Counsel pointed out that Doe's 10-year delay in reporting the abuse was suspicious and that Doe's trial testimony differed in key respects from what she initially told the detective.

B. *Legal framework*

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our Supreme Court held that the trial court did not err by admitting expert testimony that "it is not unusual for a parent to refrain from reporting a known molestation of his or her child." (*Id.* at pp. 1299-1301.) *McAlpin* likened the testimony to CSAAS evidence, approvingly cited several appellate court opinions addressing the admissibility of CSAAS evidence, and applied rules derived from those opinions in concluding that the expert's opinion was

14

admissible. (*Id.* at pp. 1300-1301.) Those principles are as follows: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*Ibid.*; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175 (*Lapenias*).)

C.      *Evidence Code section 352*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant."'" (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*).) Rather, "'"[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*Ibid.*)

15

We review for abuse of discretion the admission of evidence under Evidence Code section 352. (*People v. Parker* (2022) 13 Cal.5th 1, 39.) "'Specifically, we will not disturb the trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. Flores* (2024) 101 Cal.App.5th 438, 449 (*Flores*).)

The trial court's decision to admit the testimony of Dr. Thomas on CSAAS was a reasonable exercise of the court's discretion. Doe testified that Hernandez repeatedly sexually abused her when she was between the ages of seven and 12, but she did not report the abuse to law enforcement until she was 21 years old, several years after she moved out of the family residence. There were inconsistencies between her initial report of the abuse and her testimony concerning whether Hernandez digitally penetrated her and whether her mother was sometimes present (but asleep) in the same bed with Hernandez and Doe when he touched Doe. The defense attacked Doe's credibility on the basis of both the delayed disclosure and the discrepant disclosures. Dr. Thomas testified that it is common for children who are sexually abused by people they know to delay disclosing that abuse. She also explained that a child's reluctance to report abuse increases if an initial disclosure is not believed. And she also explained that child victims of sexual abuse can have difficulty remembering what happened and can give inconsistent accounts of the abuse. Under these circumstances, Dr. Thomas's testimony concerning CSAAS was highly probative on the issues of Doe's delayed and discrepant

16

disclosures and her credibility.[1]  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *Lapenias*, *supra*, 67 Cal.App.5th at p. 175; *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

Moreover, the contention that the CSAAS evidence is unduly prejudicial under Evidence Code section 352 merely because it bolsters Doe's credibility fails because shoring up the victim's account is precisely what makes the evidence relevant.  (*Scott*, *supra*, 52 Cal.4th at p. 490; *McAlpin*, *supra*, 53 Cal.3d at p. 1302 [expert testimony that "tended to rehabilitate the testimony of [the victim] as a corroborating witness" was "clearly relevant"].)  This is not the type of prejudice contemplated by Evidence Code section 352, which instead is concerned with evidence that """"uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.""""  (*Scott*, at p. 491; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)  Hernandez

---

[1]  Relying on *State v. Stribley* (Iowa Ct.App. 1995) 532 N.W.2d 170, Hernandez argues that the CSAAS evidence should have been excluded because CSAAS evidence is generally problematic.  To the extent that Hernandez's argument is that *Stribley* stands for the proposition that CSAAS evidence is generally inadmissible and we should follow *Stribley*, the argument fails.  *McAlpin* held to the contrary (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301), and we are bound by that precedent (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 454).  In any event, *Stribley* does not dictate a contrary result.  *Stribley* described various concerns about CSAAS evidence, including that it "is not probative of abuse" and held that the CSAAS evidence in that case would have been excluded had defense counsel objected .  (*Stribley*, at p. 173.)  However, *Stribley* also noted that CSAAS is useful for the rehabilitative functions of "explain[ing] delayed reporting of abuse, recantation of allegations of abuse, and denial abuse has occurred." (*Ibid.*)  That is consistent with *McAlpin* (*McAlpin*, at pp. 1300-1301) and with the rehabilitative purposes for which the CSAAS evidence was introduced in the present case.

does not identify any way in which the CSAAS evidence was prejudicial in the relevant sense.

For these reasons, we conclude that the trial court did not abuse its discretion by concluding that the probative value of the CSAAS evidence was not substantially outweighed by the risk of undue prejudice.[2] (*Flores*, *supra*, 101 Cal.App.5th at pp. 458-459; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

D. *CALCRIM No. 1193*

Hernandez also argues that the trial court prejudicially erred by instructing the jury with CALCRIM No. 1193 because that instruction told the jury that it could consider Dr. Thomas's testimony on CSAAS in assessing Doe's credibility. The argument fails because any error was invited.

"The doctrine of invited error bars a defendant from challenging a jury instruction given by the trial court when the defendant has requested the instruction based on a "'"'conscious and deliberate tactical choice.'"'"' (*People v. DeHoyos* (2013) 57 Cal.4th 79, 138.) The doctrine "'is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his [or her] behest.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) In order for the doctrine to apply, it

---

[2]     In a single, conclusory sentence, Hernandez contends that the admission of CSAAS evidence violated his right to due process and a fair trial. *Patino* rejected the same argument, concluding that the introduction of CSAAS testimony does not by itself deny a criminal defendant due process. (*Patino*, *supra*, 26 Cal.App.4th at p. 1747.) *Patino* based its conclusion on the fact that the admission of CSAAS evidence is analogous to the admission of evidence of battered child syndrome, which the United States Supreme Court has held does not violate due process. (*Ibid.*) We reject Hernandez's due process challenge for the same reason.

18

"'must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'" (*Ibid.*; *People v. Moon* (2005) 37 Cal.4th 1, 28.) "In cases involving an action affirmatively taken by defense counsel, [our Supreme Court has] found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*Coffman and Marlow*, at p. 49.)

Hernandez's trial counsel specifically requested that the court instruct the jury with CALCRIM No. 1193. Defense counsel also repeatedly indicated that the court needed to provide the jury with a limiting instruction on the proper use of the CSAAS evidence. Hernandez's trial counsel thus "made a conscious, deliberate tactical choice" in requesting CALCRIM No. 1193 sufficient to invoke the invited error doctrine. (*People v. Cooper* (1991) 53 Cal.3d 771, 831.) We accordingly conclude that Hernandez's challenge concerning CALCRIM No. 1193 is barred. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293-1294; *People v. Riazati* (2011) 195 Cal.App.4th 514, 530.)

In any event, even if the challenge were not barred, we would conclude that the trial court did not err by instructing the jury with CALCRIM No. 1193. Hernandez challenges the portion of the instruction that told the jury that it could consider the CSAAS evidence "in evaluating the believability of [Doe's] testimony." Hernandez contends that CALCRIM No. 1193's "admonition that the jurors could consider the CSAAS testimony in appraising [Doe's] credibility was erroneous because the jurors should be instructed simply that CSAAS testimony is admissible solely to explain that the victim['s] response to the sexual abuse is not inconsistent with molestation, and the

19

expert's testimony may not be relied on to evaluate whether the victim['s] molestation claim is true." He also contends that by bolstering Doe's credibility CALCRIM No. 1193 lessened the prosecution's burden of proof and thus violated due process. The challenged language is the same as that contained in the model version of CALCRIM No. 1193. Other appellate courts have "held the pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504; *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474.) In reaching that conclusion, *Lapenias* reasoned that CALCRIM No. 1193 "accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence" as described by the Supreme Court in *McAlpin*. (*Lapenias*, at p. 176.) We agree with that analysis and reach the same conclusion. Even if Hernandez's challenge to the trial court giving CALCRIM No. 1193 was not barred, the trial court did not err by giving the instruction.

II.     *Sentencing*

As amended effective September 9, 2010, the current sentencing triad for engaging in lewd and lascivious conduct with a child under age 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim" is five, eight, or 10 years. (§ 288, subd. (b)(1); Stats. 2010, ch. 219, §§ 7, 29.) Before that amendment, a violation of the provision was punishable by a term of three, six, or

eight years. (Former § 288, subd. (b)(1).) The jury found Hernandez guilty of four counts of lewd and lascivious conduct as charged in the information (counts 3-6), which in turn alleged that the underlying conduct occurred between November 2005 through November 2010. The trial court sentenced Hernandez to the "low term of five years" for each of the four lewd and lascivious conduct counts.

Hernandez argues, the People concede, and we agree that sentencing Hernandez pursuant to the current sentencing triad violates the ex post facto clauses of the United States Constitution and the California Constitution. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; *People v. Riskin* (2006) 143 Cal.App.4th 234, 244-245.) "Both constitutions protect against the later adoption of a statute that inflicts greater punishment than the law in effect at the time of the commission of the crime." (*Riskin*, at p. 244.) The jury did not make any findings on the specific time frame during which the offenses were committed, and the record contains no basis to determine whether the jury based its verdicts on acts that occurred on or after September 9, 2010. We consequently must vacate Hernandez's sentences on counts 3 through 6.

Moreover, because we are vacating Hernandez's sentences on the four lewd and lascivious conduct counts, we must vacate his entire sentence and remand for a full resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) Under the full resentencing rule, "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'" (*Ibid.*; *People v. Valenzuela* (2019) 7

21

Cal.5th 415, 424-425.)  The sentence imposed on resentencing shall not exceed the original aggregate sentence.  (*People v. Jones* (1994) 24 Cal.App.4th 1780, 1783-1784; *People v. Hanson* (2000) 23 Cal.4th 355, 357-358.)  On the lewd and lascivious conduct counts, the trial court shall resentence Hernandez using the sentencing triad effective before September 9, 2010.  (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 262.)

## DISPOSITION

The sentence is vacated.  The matter is remanded for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.